# 23-0720-cv

# United States Court of Appeals
## *for the*
## Second Circuit

MENORAH MIVTACHIM INSURANCE LTD., MENORAH MIVTACHIM
PENSIONS AND GEMEL LTD., PHOENIX INSURANCE COMPANY LTD.,
MEITAV DS PROVIDENT FUNDS AND PENSION LTD.,

*Movants-Appellants,*

STEF VAN DUPPEN, individually and on behalf of others
similarly situated, LANDON W. PERDUE, individually
and on behalf of all others similarly situated,

*Plaintiffs,*

— v. —

JOHN D. SHEEHAN,

*Defendant-Consolidated-Defendant-Appellee,*

HEATHER BRESCH, ROBERT J. COURY, PAUL B. CAMPBELL,
KENNETH S. PARKS, MYLAN N.V., MYLAN, INC.,

*Consolidated-Defendants-Appellees,*

RAJIV MALIK, JAMES NESTA,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PROOF BRIEF FOR MOVANTS-APPELLANTS
## (REDACTED VERSION)

KEVIN K. RUSSELL
GOLDSTEIN, RUSSELL & WOOFTER LLC
1701 Pennsylvania Ave. NW, Suite 200
Washington DC 20006
(202) 240-8433

JEREMY A. LIEBERMAN
AUSTIN P. VAN
POMERANTZ LLP
600 3rd Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

*Attorneys for Movants-Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL • (321174)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Menorah Mivtachim Insurance Ltd. and Menorah Mivtachim Pensions and Gemel Ltd. each state that Menorah Mivtachim Holdings Limited owns 100% of Plaintiff-Appellant Menorah Mivtachim Insurance Ltd. and 90.01% of Menorah Mivtachim Pensions and Gemel Ltd. Plaintiff-Appellants Phoenix Insurance Company Ltd. and Meitav DS Provident Funds and Pension Ltd., each state that the Phoenix Holdings Ltd., a publicly held company, holds 100% of Phoenix Insurance Company Ltd., and Meitav Investment House Ltd., a publicly held company, holds 100% of Meitav DS Provident Funds and Pension Ltd.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................1

STATEMENT OF THE CASE...................................................................2

    I.     Factual Background.....................................................................4

          A.    Mylan's EpiPen Rebates .............................................. 4

          B.    The Generic Drug Conspiracies................................. 8

    II.    Procedural History...................................................................12

SUMMARY OF THE ARGUMENT .....................................................14

STANDARD OF REVIEW ...................................................................16

ARGUMENT ........................................................................................17

    I.     THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON PLAINTIFFS' REBATE CLAIMS. ......................17

          A.    Defendants Made Material Misrepresentations About The EpiPen Rebate Rates. ............................................. 17

          B.    Defendants Made Material Misrepresentations About Government Investigations. ...................................... 19

          C.    Defendants Made Material Misrepresentations About The Government's Reaction To The EpiPen Classification. .......... 24

    II.    THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON PLAINTIFFS' GENERIC DRUG CLAIMS. ........25

          A.    The District Court Erred In Requiring Plaintiffs To Prove That Mylan Violated The Sherman Act................................. 25

          B.    Reasonable Jurors Could Find Mylan Conspired To Allocate Customers With Its Rivals In Violation Of The Sherman Act. .......................................................... 28

ii

1.  Plaintiffs Need Adduce Only Sufficient Evidence To Allow A Reasonable Jury To Find An Agreement. ...... 29

2.  Plaintiffs Adduced Sufficient Direct And Indirect Evidence Of An Agreement To Allocate Customers. ... 31

3.  The District Court's Rejection of Plaintiffs' Evidence Was Permeated With Legal Error................................. 40

C.  Plaintiffs Adduced Sufficient Evidence Of An Agreement To Fix Prices. ........................................................... 51

D.  Plaintiffs Adduced Sufficient Evidence On Loss Causation. .. 56

III.  REASONABLE JURORS COULD FIND SECTION 20(A) LIABILITY. ........................................................................62

CONCLUSION ..................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alaska Electr. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) ............................................................54

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    899 F.3d 87 (2d Cir. 2018) ..........................................................................31

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987) ........................................................................29

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)......................................................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2005)............................................................................. 30, 54

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)............................................................................. 55, 56

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) .................................................................................27

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)......................................................................................29

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992)......................................................................................40

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ........................................................................56

*FIH, LLC v. Found. Cap. Partners LLC*,
    920 F.3d 134 (2d Cir. 2019) ........................................................................17

*In re 650 Fifth Ave. & Related Props.*,
    934 F.3d 147 (2d Cir. 2019) ............................................................... 34, 44

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ..........................................................................21

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ............................................................... 46, 47

iv

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..........................................21

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) ...........................................41

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ................................... *passim*

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ...........................................39

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .........................................21

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ......................................... 56, 57, 58

*Lefkowitz v. Cunningham*,
  431 U.S. 801 (1977)..........................................44

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ..........................................56

*LiButti v. United States*,
  107 F.3d 110 (2d Cir. 1997) ..........................................34

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..........................................22

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)......................................... 29, 39, 41

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ..........................................54

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ..................................... 21, 22, 23, 24

*Noto v. 22d Century Group, Inc.*,
  35 F.4th 95 (2d Cir. 2022) ................................... 20, 21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) ......................................... 30, 38, 48

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
  207 F. Supp. 2d 292 (S.D.N.Y 2002) .........................................23

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................22

*Starr v. Sony BMB Ent.*,
    592 F.3d 314 (2d Cir. 2010) ................................................. 33, 52

*Stichting Ter Behartiging v. Schreiber*,
    407 F.3d 34 (2d Cir. 2005) ..........................................................44

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .............................................. *passim*

*United States v. Wilkinson*,
    754 F.2d 1427 (2d Cir. 1985) .......................................................33

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (2017) ......................................................................48

**Statutes & Other Authorities:**

15 U.S.C. § 78aa ...............................................................................1

15 U.S.C. § 78j(b) ...........................................................................12

15 U.S.C. § 78t(a) ...........................................................................12

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

42 U.S.C. §§ 1396-1396v ......................................................... 2, 4, 6

42 U.S.C. § 1396r-8(c)(1)(A)-(B) .................................................4

42 U.S.C. § 1396r-8(c)(3)(B) .........................................................4

42 U.S.C. § 1396r-8(k)(7)(A)(i)-(iv) .............................................4

42 U.S.C. § 1396r-8(k)(7)(A)(i) .....................................................5

42 U.S.C. § 1396r-8(k)(7)(A)(iii) ...................................................5

Phillip E. Areeda, *Fundamentals of Antitrust Law* ......................48

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. The District Court entered final judgment on March 31, 2023. (Dkt. No. 464). Appellants filed a timely Notice of Appeal on April 26, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether reasonable jurors could find, or would be compelled to find, that Defendants-Appellees knowingly made material misrepresentations regarding (a) the Medicaid rebates Mylan provided on its EpiPen product, (b) the existence of government inquiries and investigations into Mylan's compliance with the rebate rules; and (c) the government's response to Mylan's EpiPen rebate rate.

2.     Whether Defendants-Appellees could mislead investors regarding Mylan's collusive activity with other generic drug makers only if that conduct amounted to a violation of Section 1 of the Sherman Act.

3.     Whether, if a Sherman Act violation was required, Plaintiffs-Appellants adduced sufficient evidence to allow a reasonable jury to find that Defendants-Appellees engaged in illegal customer allocation and/or price fixing in violation of Section 1.

4. Whether the District Court erred in holding that no reasonable juror could find that Defendants-Appellees' misrepresentations and omissions concerning Mylan's generic drug business caused investors losses.

## STATEMENT OF THE CASE

Defendants-Appellees Mylan N.V. and Mylan, Inc. ("Company") manufactured and sold EpiPen, a popular brand-name medication for treating severe allergic reactions, as well as a variety of generic drugs. Between February 21, 2012 and May 24, 2019 (the "Class Period"), the Company and its officers (collectively "Mylan"), engaged in two distinct schemes to artificially inflate Mylan's earnings and stock price. Both schemes were eventually discovered, leading to criminal charges and civil lawsuits by the U.S. Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and 46 state attorneys general. The federal lawsuits settled for nearly half-a-billion dollars, while the state litigation remains ongoing.

In the first scheme, Mylan overcharged Medicaid by hundreds of millions of dollars by misclassifying EpiPen for purposes of the Medicaid Drug Rebate Program ("MDRP"), 42 U.S.C. §§ 1396-1396v, a statute that requires drug makers to provide rebates to the Medicaid program. Although the law generally requires a 23% rebate for name-brand drugs like EpiPen, Mylan classified the product in the same category as generic drugs, which requires only a 13% discount. It did so based on an

extremely tenuous reading of the law that the government drew into question in a series of inquiries that culminated in a DOJ investigation in 2014. Although EpiPen accounted for more than a third of Mylan's profits, Mylan kept investors in the dark about the investigation, repeatedly conveying that it was providing the government the maximum 23% rebate and implying that no investigation into its practices was pending.

Separately, Mylan inflated the revenues for its generics business by participating in what law enforcement officials have called "likely the largest cartel in the history of the United States," allocating customers and fixing prices of dozens of generic drugs. Ex.(496at¶125). That scheme, too, was ultimately discovered, leading to federal indictments and plea deals with multiple co-conspirators, as well as civil suits by nearly every state in the country. One company president confessed to conspiring with Mylan. ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

█████████████████

Rather than disclose that Mylan's high gross margins and net income were the result of unsustainable collusion, Mylan told investors that the market was "highly competitive" and attributed its present success to other factors investors could believe justified the firm's stock valuation over the long term. When the truth came out, investors suffered heavy losses, leading to this litigation.

## I. Factual Background

### A. Mylan's EpiPen Rebates

Under the MDRP statute, drug companies must provide Medicaid rebates off their normal prices. The rules classify drugs into three categories: (1) "S-drugs," or single source drugs; (2) "I-drugs," or innovator multiple source drugs; and (3) "N-drugs," or non-innovator multiple source drugs. *See* 42 U.S.C. § 1396r-8(k)(7)(A)(i)-(iv). Drugmakers must give Medicaid a 23% rebate on S- and I- drugs and a 13% rebate on N-drugs. *See id*. §§ 1396r-8(c)(1)(A)-(B), 1396r-8(c)(3)(B).

Classification depends in large part on the kind of approval process the drug went through at the Food and Drug Administration ("FDA"). The FDA approves newly developed drugs through a "new drug application" or "NDA." Ex.(442). Generic drugs, in contrast, can be approved through an *abbreviated* NDA (ANDA),

relying on the scrutiny previously applied to the name-brand version of the same medication.  Exs.(442)(393at¶¶19-20).

Low-rebate N-drugs are defined as drugs that were not originally marketed under an NDA and are available from multiple sources.[1]  This posed a problem for Mylan, which wanted to classify EpiPen as an N-drug to take advantage of the lower rebate—EpiPen was approved and marketed under an NDA and, at the times relevant, was not a multiple-source drug because there were no other therapeutic equivalents.[2]  ¶¶(1409-21), Ex.(397at9).  Mylan, however, developed a complicated—and, at best, highly contestable—theory that there are some drugs approved under an NDA that could nonetheless qualify as N-drugs.[3]  ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] Specifically, N-drugs are defined as "a multiple source drug that is not an innovator [*i.e.*, I-drug] multiple source drug."  *Id*. § 1396r-8(k)(7)(A)(iii).  An "innovator multiple source drug," in turn, is defined as a "a multiple source drug that was originally marketed under an original new drug application.  *Id*. § 1396r-8(k)(7)(A)(iii).

[2] A "multiple source drug" is defined as one for which there is "at least one other drug" sold in the United States that is "therapeutically equivalent," "pharmaceutically equivalent and bioequivalent."  *Id*. § 1396r-8(k)(7)(A)(i).

[3] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

██████████████████████████████████████████

██  ████  ████        ████████    ████████

████████████████████

As early as 2011, the Centers for Medicare and Medicaid Services ("CMS"), the agency charged with administering the rebate program, ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██  ████████████████████████████████████

████████████████████████████████████  ████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

Eight days later, on November 7, 2014, DOJ sent Mylan a subpoena for documents concerning EpiPen's MDRP classification. ¶¶(1347-48); Ex.(168at653-54). For nearly two years, Mylan participated in that investigation, providing

documents, making presentations and settlement offers to DOJ, Ex.(1717), and eventually negotiating a $465 million settlement in October of 2016. Exs.(93at427)(379at112:6-13, 123:21-125:14)(496at¶93)(1718).

During this time, Mylan misled investors about its rebate practices and the government's reaction to them. In its 2012-2014 Annual Reports, Mylan falsely conveyed that EpiPen was being rebated at the maximum 23%. It explained that the "required rebate is currently 13%" for "sales of Medicaid-reimbursed products marketed under ANDAs," while "products marketed under NDAs require manufacturers to rebate . . . 23%." Exs.(80at459)(81at416)(89at532). In other words, as the District Court would later summarize, Mylan told investors: "if ANDA, then 13%" and if NDA, then 23%. Op.38. Because it was widely understood that EpiPen, like almost all name-brand drugs, was approved under an NDA,[4] the statement clearly conveyed to investors that Mylan was providing a 23% rebate on EpiPen sales, when, in fact, Mylan was providing only a 13% discount. Op.38.[5]

At the same time, in its Annual Reports, Mylan warned that "should there be ambiguity with regard to how to properly calculate and report payments – and even

---

[4] Exs.(107at527-28, 536-39)(396at9)(114atTab "A," B17-20, C17-20).

[5] *See also* Exs.(138atAZ2-5)(139at738-39)(140atB5, B9-12, F5, F9-12)(157)(158atTab "A", G19-22)(363at23:7-9, 42:22-43:20).

in the absence of such an ambiguity – a governmental authority may take a position contrary to a position we have taken." Exs.(511at332)(81at430)(80at472)(89at551)(82at80). It further stated that any "failure to comply" with its Medicaid obligations could "subject us to investigation" and that such an investigation could lead the government "to impose . . . sanctions." Exs.(82at80)(8at012). Mylan did not disclose that CMS had been questioning EpiPen's classification since 2011 and that the Company had been under DOJ investigation regarding that classification since 2014.

In 2019, the SEC sued Mylan for misleading investors by: (1) failing to timely disclose or accrue for the likely liability that would result from the DOJ investigation; and (2) "misleadingly stat[ing] that the company faced merely the risk that CMS may take the position that Mylan's submissions to CMS were incorrect." Ex.(1717). Mylan settled for an additional $30 million. *Id.* ¶(1381).

### B. The Generic Drug Conspiracies

Defendants also misled investors by describing the market for generic drugs as highly competitive and attributing Mylan's financial success to a variety of innocent factors without disclosing that this success was due in substantial part to the lack of real competition, secured through an unsustainable conspiracy.

During the Class Period, Mylan conspired with numerous other generic makers to allocate customers under "fair share" agreements and to fix the prices of

generic drugs. When the scheme was discovered, federal prosecutors charged officials at Heritage, Teva, Glenmark, Sandoz, Rising, Apotex, and Taro, along with a number of their employees, with criminal violations of Section 1 of the Sherman Act, entering into plea deals with most of the participants.[6]  In those agreements, the defendants admitted broadly to conspiring to fix prices and allocate customers for generic drugs during the Class Period.  Exs.(1631at1, 4, 16)(1632at1, 14)(1633)(1702at1, 17).

Heritage CEO Jeffrey Glazer specifically admitted that he and Mylan President Rajiv Malik conspired to "allocate customers, rig bids and fix and maintain the prices of Doxy DR sold in the United States."  Ex.(529at8:22-9:4, 18:11-21:20, 23:7-12). Heritage itself admitted to conspiring with unnamed co-conspirators regarding Doxy DR and glyburide, both drugs Mylan sells.  Exs.(1631at1, 4, 16)(769at649, 769).  Another company, Sandoz, admitted to conspiring broadly to fix the prices of "generic drugs," and specifically to conspiring to fix the price of benazepril, another drug at issue in this case.  *Id*.  ¶¶(1662)(2088), Exs.(169)(1702).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[6]  ¶¶(2080-90),   Exs.(169at3-4)(394at¶¶478-500)(1630at23:3-8)(1631at1,   4, 16)(1632at1, 14)(1633)(1634at1, 16)(1635)(1702at1, 17)(1708).





In addition to criminal actions, Mylan and its co-conspirators were subject to civil suits by 46 state attorneys general, alleging a conspiracy covering 300 drugs and virtually the entire generic drug industry. ¶¶(2076-79), Ex.(496at¶115).

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████ As the market became aware of the investigations, and the likelihood that Mylan's recent financial performance depended on its unsustainable cooperation with its competitors, the stock price fell, injuring investors who purchased shares at artificially inflated prices and leading to this litigation.

## II.    Procedural History

Plaintiffs filed this class action on behalf of investors who purchased Mylan shares between February 21, 2012 and May 24, 2019 (the "Class Period").  Plaintiffs alleged violations of Section 10(b) and 20(a) the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), challenging Mylan's deceptive statements regarding its EpiPen rebates and relationship with other generic drug makers.[11]

In March 2023, the District Court granted Mylan's motion for summary judgment and denied Plaintiffs' cross-motion for partial summary judgment. (Dkt. Nos. 463-64).  The Court failed to address Plaintiffs' lead argument that Mylan

---

[11] Plaintiffs brought other claims as well, but are not pursuing them in this appeal.

misled investors by falsely conveying that it was providing the government the maximum rebate for EpiPen. Instead, the Court focused principally on whether Mylan deceived investors as to whether the government had contradicted the Company's interpretation of the rebate rules. Without deciding whether Mylan's interpretation was correct, the Court held that Mylan's statements were not knowingly misleading because although CMS repeatedly questioned Mylan's EpiPen classification, Mylan could reasonably believe that the agency had not definitively rejected the classification. Op.39-45, 51-52. The Court acknowledged that after the last CMS call, DOJ opened an investigation into the matter. Op.53. But it held that any misleading impression was immaterial because the Company could have reasonably believed the investigation was unfounded. *Id.* In addition, the Court held that Mylan did not mislead investors because its statements noted the theoretical *risk* that an investigation *might* be ongoing, even though Mylan knew that the risk had already materialized. *Id.*

The Court also dismissed Plaintiffs' generic drug claims. It first held that to survive summary judgment, Plaintiffs had to demonstrate that Mylan violated the Sherman Act for each of the 21 generic drug for which it had found sufficient allegations in the complaint ("Generic Drugs"). Op.54.[12] The Court then found that despite the admissions from multiple co-conspirators, Mylan officials' repeated

---

[12] *See* Pls.' SJ Br. iv (listing drugs).

invocations of the Fifth Amendment, and extensive corroborating evidence including emails and phone records preceding historically unprecedented price hikes, no reasonable juror could find that Mylan agreed to the conspiracy. *Id*. 56. The Court further held no reasonable juror could find that any misrepresentations caused losses to investors. *Id*. 71-77.

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Plaintiffs' claims relating to Mylan's misleading statements regarding its EpiPen rebates and its generic drug business.

**I.** The Court erred first in failing to address Plaintiffs' principal rebate argument, which was that Mylan misled investors by conveying that it was providing Medicaid the maximum 23% rebate rate. It did so by representing that drugs approved under an NDA require a 23% rebate when everyone knew (and Mylan admits) EpiPen was approved under an NDA. It makes no difference if Mylan had a tenuous theory that EpiPen fell into some exception to that general rule. Reasonable investors would have understood that if Mylan's most important product fell within such an exception, Mylan would have mentioned it. By misleading the market into thinking it was providing the government the maximum rebate, Mylan deprived investors of the opportunity to decide for themselves the degree of financial risk the Company's rebating practices posed.

Mylan also misled investors when it implied that it was not currently subject to an investigation when, in fact, it was. The District Court erred in holding that Mylan was justified in misleading investors because it supposedly believed that the investigation had no merit. Materiality depends on whether reasonable investors would have found the information important, which they surely would have, given the prospect (realized here) that the investigation could financially damage the Company. Nor did anything else in Mylan's disclosures remotely reveal what the investigation statements concealed.

For similar reason, Mylan's warnings that the government *might* disagree with the Company's reading of the Medicaid rules were misleading when, in fact, CMS had repeatedly questioned EpiPen's classification, ultimately leading to a DOJ investigation and near-half-billion-dollar settlement.

**II.** Mylan also misled investors regarding the state of competition in the generic drug market and the true causes of its financial success. Reasonable jurors could find that a large source of Mylan's profits arose from its participation in a broad conspiracy with other pharmaceutical companies to allocate the markets for, and fix the prices of, the Generic Drugs. The government prosecuted numerous firms for engaging in precisely such a conspiracy, with one rival's CEO specifically pleading guilty to conspiring with Mylan to allocate customers and fix prices of a generic drug and another company pleading guilty to conspiring to fix the prices of

one of the drugs at issue in this litigation. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ This Court has

sent antitrust cases to juries, even those involving oligopolies, on far less compelling

proof. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012).

The District Court could only find this evidence insufficient by expressly

imposing a heightened burden of proof for oligopoly cases that has no basis in this

Court's precedents. At the same time, the Court repeatedly drew inferences, and

resolved ambiguities in the evidence, in Defendants' favor, again on the misguided

view that antitrust law provides special solicitude for oligopolies. Reviewed under

proper legal standards, the evidence more than sufficed to survive summary

judgment.

## STANDARD OF REVIEW

This Court reviews a district court's decision granting summary judgment *de

novo*, and will affirm only if the record, viewed in the light most favorable to

appellants, shows no "genuine dispute of material fact." *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019) (citation omitted).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON PLAINTIFFS' REBATE CLAIMS.

The District Court erred first in dismissing Plaintiffs' claims relating to Mylan's EpiPen rebates to the Medicaid Program.

### A. Defendants Made Material Misrepresentations About The EpiPen Rebate Rates.

Early in the case, the District Court acknowledged that Mylan had informed the market that it was rebating EpiPen at the maximum statutory rate of 23%, when in fact it was applying a dramatically lower 13% rate. MTD Op. I 15. Although Plaintiffs made that claim as their lead argument in their summary judgment brief, the District Court failed to address it. *Compare* Pls.' SJ Br. 6-10 (Section III.A) *with* Op.34-53 (addressing other rebate theories); *see also* Defs.' SJ Reply 17-26 (addressing rebate-rate argument in separate subsection of brief). Instead, the Court focused on the distinct question—not at issue in this appeal—of whether Mylan knowingly misled investors by implying that regulators never contradicted its classification. Op.38-50. That conclusion, however, did not resolve Plaintiffs' separate claim that Mylan falsely conveyed to the market that Mylan was providing the government the maximum 23% rebate, effectively assuring the market that the Company faced little rebate-related risk regarding its marquee product.

This Court could vacate and remand with instructions to address the overlooked claim, but because the answer is clear, the Court should instead order entry of partial summary judgment in Plaintiffs' favor.

As Defendants admit, and the market had long been aware, EpiPen was approved and marketed under an NDA, as almost all brand-name drugs are.[13] Against this background, Mylan told investors that:

> The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed products marketed under ANDAs . . . . Sales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate . . . 23% . . . of the average manufacturer's price . . . .

Exs.(511at317); (80at459)(81at416)(89at532)(82at59). As the District Court explained, this description was made "misleading by Mylan's failure to disclose that this formula was untrue in the case of the EpiPen, which, was marketed under an NDA but rebated at 13%." MTD Op. I 15; ██████████████████████
██████████████████████

The District Court's (incorrect) finding that Mylan reasonably believed EpiPen fell within an exception to the rule it described for investors, Op.43, has no

---

[13] Exs.(107at527-28, 536-39)(114atTab "A," B17-20, C17-20, D17-20; E17-20, G17-20)(138atAZ2-5)(139at738-39)(140atB5, B9-12, F5, F9-12)(157)(158atTab "A", G19-22)(363at23:7-9, 42:22-43:20)(396at9).

bearing on whether its public statements were misleading.[14]  Because Mylan kept its novel exception theory to itself, the public would reasonably understand the Company's description of the rebate categories was accurately describing *all the rules relevant* to Mylan's most important offerings.  After all, EpiPen generated hundreds of millions of dollars in revenues and by the end of the Class Period was responsible for more than 95% of the Company's profits.[15]

Had Mylan not misled the market, investors could have decided for themselves how risky Mylan's rebating decision was and valued its stock accordingly.  Mylan's failure to do so suggests it wanted to avoid that scrutiny and its inevitable effect on the Company's stock price.

### B.  Defendants Made Material Misrepresentations About Government Investigations.

Investors surely would have made their own judgments about the riskiness of Mylan's rebate practices had they known that the government was questioning or investigating those rebates.  But Mylan withheld that information as well, falsely implying that no such inquiries or investigations existed.

---

[14] The Court's finding that Mylan reasonably believed its rebate was lawful was wrong, but given space constraints, Plaintiffs have elected not to challenge it on appeal.

[15] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████

During the Class Period, Mylan warned, "any failure to comply with [Medicaid] obligations could subject us to investigation." Exs.(89at551);(82at80). As the District Court originally held in denying Mylan's motion to dismiss, a "reasonable investor could have concluded from Mylan's statement that although the government . . . 'could' open an investigation, such unfavorable events had not yet occurred." MTD Op. I 19. That natural implication, however, was false. CMS had questioned the EpiPen classification as early as 2011 and was not placated by Mylan's invocation of the 1997 letter from a mid-level CMS employee purportedly approving the classification or Mylan's explanation of its novel legal theory. *See supra* 6. ████████████████████████████████████████

████████████████████████████████████████████████████

████████    ████    Eight days later, Mylan received a subpoena from the DOJ, alerting it to the Department's investigation into the EpiPen rebate. *Id.* For the next two years, Mylan provided DOJ documents, engaged in settlement negotiations, and ultimately agreed to pay $465 million to resolve the charges. *Id.* All the while, Mylan publicly treated the prospect of such an investigation as nothing more than a theoretical possibility.

While companies generally have no independent obligation to announce when they are subject to an investigation, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Noto v. 22d Century Group, Inc*., 35 F.4th

95, 106 (2d Cir. 2022) (citation omitted). In *Noto*, for example, this Court held a company misled investors by discussing "accounting weaknesses" without disclosing that the SEC was investigating its accounting practices. *Id.* at 105. In *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014), the Court similarly held that "comforting statements in the prospectus about [environmental] compliance measures" were misleading given the failure to disclose an ongoing government investigation into environmental compliance. *Id.* at 250-51.

Here, having elected to discuss the prospect of government investigations into its Medicaid compliance, Mylan was obligated to tell the whole truth about the subject, including that an investigation was ongoing. As the District Court acknowledged earlier in the case, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." MTD Op. I 19 (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005). Applying that insight, "[c]ourts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (collecting authorities); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) (warnings that cybersecurity incidents could adversely affect a business "were

misleading to a reasonable investor when [the defendant] knew those risks had materialized"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Telling the whole truth about the investigation was particularly important when Mylan had already misled investors into thinking there was little rebate-related legal risk because the Company was already giving Medicaid the maximum rebate. The District Court nonetheless dismissed, for two reasons.

*First*, the Court concluded that "no one at Mylan would have had reason to think the subpoena material" because the Company "reasonably thought" it was "in the right regarding how it classified the EpiPen." Op.53. But the question is not whether Mylan employees thought the investigation was material; it is whether "the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (cleaned up). And reasonable investors would have thought the existence of an investigation was material for the reasons Mylan itself gave: the government might disagree with Mylan's position and "seek to impose . . . sanctions," as it ultimately did. Exs.(89at551)(82at80) (30)(168)(363)(496at¶93); *Jinkosolar*, 761 F.3d at 252. And even if an investigation

did not ultimately result in charges, it could be costly, distracting, and damaging to the firm's reputation.

*Second*, the Court held that the statements were not misleading because Mylan "plainly warn[ed] of the risk that a government regulator may have initiated an investigation into Mylan's rebating." Op.53. The Court was referring to a separate statement in Mylan's Annual Reports warning that "[a]ny governmental agencies or authorities that *have commenced, or may commence*, an investigation of Mylan . . . could seek to impose . . . civil and/or criminal sanctions." Ex.(89at551) (emphasis added). But that language did nothing to apprise investors that an investigation *had* commenced—it referred in the alternative to investigations that "have commenced, *or* may commence." *Id*. (emphasis added). The statement would have been accurate even if no investigation was pending. Such a "generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Jinkosolar*, 761 F.3d at 251. The statement was particularly insufficient to correct the misleading impression left by the more specific statements that strongly implied no investigation was pending. *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F.Supp.2d 292, 297 (S.D.N.Y 2002) (boilerplate warning that investigation was possible did not constitute an "announcement of an FTC investigation").

Indeed, the warning was itself misleading for the reasons discussed above—it treated the prospect of a present investigation as a hypothetical possibility when the risk had already materialized. *See, e.g.*, *Jinkosolar*, 761 F.3d at 248 (warning that the "non-compliance with [government] regulations may result" in "significant monetary damages" or "fines" was misleading when investigation was underway).

### C. Defendants Made Material Misrepresentations About The Government's Reaction To The EpiPen Classification.

The same facts rendered misleading Mylan's additional statements that "should there be ambiguity with regard to how to properly calculate and report payments – and even in the absence of such an ambiguity – a governmental authority may take a position contrary to a position we have taken." Exs.(511at332). The District Court concluded that Mylan could reasonably believe that CMS had not reached a final, conclusive decision that the EpiPen classification was wrong. Op.53. But even if that were so, Defendants knew that CMS had repeatedly questioned the classification, had not been placated by Mylan's explanation, and that the question remained unresolved even as it had spawned a DOJ investigation. In that context, simply saying that the government *might* disagree with Mylan's reading of the rules was a misleading failure to tell the whole truth.

\* \* \*

Because no reasonable juror could decline to find Mylan's rebate statements materially misleading, this Court should reverse their dismissal and order the District

Court to enter partial summary judgment in Plaintiffs' favor on falsity and materiality. *See* Pls.' SJ Br. § III (requesting partial summary judgment on falsity and materiality).

## II. THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON PLAINTIFFS' GENERIC DRUG CLAIMS.

Mylan also misled investors by emphasizing the competitive nature of the generic drugs market, and describing the sources of its financial success, without disclosing that it was participating in one of the largest antitrust conspiracies ever prosecuted. The District Court did not dispute that those statements would be misleading if, in fact, Mylan were part of such a conspiracy. It further did not contest that a jury could reasonably find that Mylan and its supposed competitors regularly forwent competition for customers and enacted massive, historically unprecedented parallel price increases on generic drugs, sometimes by more than 1000%. The Court nonetheless entered summary judgment on the ground that no reasonable jury could find that Mylan had agreed to join a conspiracy in violation of the Sherman Act or that any such conspiracy had caused Plaintiffs' losses. Those holdings are premised on a multitude of legal errors and misconstruction of the evidence.

### A. The District Court Erred In Requiring Plaintiffs To Prove That Mylan Violated The Sherman Act.

The Court started down the wrong path early, ruling at the motion-to-dismiss stage that Plaintiffs could prevail only if they could prove that Mylan's collusive

conduct was, in fact, unlawful; only if it was unlawful under one statute in particular, the federal Sherman Act; and only if that Sherman Act conspiracy extended to 21 specific drugs. *See* MTD Op. II 11. Those limitations were unwarranted.

Plaintiffs alleged that Mylan's statements were misleading because they failed to tell the whole truth in describing the market for generic drugs. Mylan stated that the market was "very competitive" and "highly sensitive to price," listed other generic companies as Mylan's "primary competitors," and described the "primary means of competition" in the market, all without disclosing that Mylan was colluding with those "competitors" to raise prices and allocate customers. Ex.(8at969-71).[16] Plaintiffs likewise alleged that Mylan failed to tell the whole truth when it listed the reasons for its present financial success (*e.g.*, "new product introductions in North America") without disclosing that its success was premised in material part on unsustainable customer-allocation and price-fixing agreements with its competitors. Ex.(27at2874-75).[17]

Reasonable investors would find those omissions materially misleading regardless of whether that collusion violated the Sherman Act or, indeed, any law. Even if not technically unlawful, the conduct could attract law enforcement scrutiny, prompt expensive and distracting litigation, alienate customers, generate bad

---

[16] *See* MTD Op. I 13 (listing statements).

[17] MTD Op. I 14.

26

publicity, or otherwise harm the Company. Investors further could reasonably worry that for all these reasons, the present financial success on which the stock price was based was unsustainable—lawful or not, cartels can be hard to keep together and law enforcement scrutiny may cause members to abandon the project. ███████

███████████████████████████████████████

███████████████████████████████████████

███████

Moreover, even if for some reason Plaintiffs were required to prove the conspiracy was unlawful, they should have been allowed to prove a violation of *any* competition law, including state laws that do not replicate the Sherman Act's more onerous requirements for plaintiffs. *See, e.g.*, *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 185-87 (1999) (comparing requirements of Sherman Act to California's Unfair Competition statute written in the "disjunctive" in which "unfair" "means conduct that threatens an incipient violation of an antitrust law, *or* violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or* otherwise significantly threatens or harms competition") (emphasis added).

Finally, the Court compounded its error by insisting that Plaintiffs prove Sherman Act violations one drug at a time, and only with respect to the 21 drugs for which it found adequate allegations at the pleading stage. *See* Op.54-55. Mylan's

challenged statements did not reference individual drugs—they were misleading for generally failing to tell the whole truth about the Company's collusive activity. Although Plaintiffs proved much more, even if they had provided a basis for a reasonable jury to find only that Mylan conspired to allocate customers with one competitor regarding one drug, that would render the Company's competition-related statements materially misleading. Moreover, as discussed next, this error led the Court to wrongly restrict the evidence through which Plaintiffs could prove their claims.

### B. Reasonable Jurors Could Find Mylan Conspired To Allocate Customers With Its Rivals In Violation Of The Sherman Act.

The District Court's only basis for finding Plaintiffs failed to substantiate a Sherman Act claim was its belief that no reasonable jury could find that Mylan had agreed to collude. Op.54-68. But much of that conclusion rests on the Court's view that antitrust law not only grudgingly tolerates so-called "conscious parallelism" among oligopolists but provides them special protection, "elevat[ing] a plaintiff's evidentiary burden" and imposing "specialized evidentiary standards" that effectively "immunize" oligopolists' efforts to "coordinate" through direct communications, so long as they are not so foolish as to memorialize an express agreement. *Id*. at 58-59, 64 (citation omitted). That view has no support in this Court's jurisprudence and should be firmly rejected in this case.

1.	*Plaintiffs Need Adduce Only Sufficient Evidence To Allow A Reasonable Jury To Find An Agreement.*

It is a per se violation of the Sherman Act to conspire to fix prices or allocate markets or customers. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). In many cases, including this one, the "crucial question" is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (cleaned up).

Plaintiffs may establish an agreement through direct or indirect evidence. *Id.* When a plaintiff relies exclusively on indirect evidence, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In particular, "evidence of parallel conduct alone cannot suffice to prove an antitrust conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). A plaintiff must also offer evidence that "tends to exclude the possibility that the alleged conspirators act[ed] independently." *Matsushita*, 475 U.S. at 575 (cleaned up). "[I]n other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of competing inferences of independent action or collusive action." *Id.* at 588.

A plaintiff may do this by pointing to "additional circumstances" beyond parallel conduct, "often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a

conspiracy." *Apple*, 791 F.3d at 315 (citation omitted). Plus factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Apple*, 791 F.3d at 315 (citation omitted). This list is only illustrative and does not preclude plaintiffs from relying on other evidence, such as the "historically unprecedented" nature of parallel price increases or "evidence implying a traditional conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2005); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1244 (3d Cir. 1993).

The "acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the dangers associated with such inferences." *Petruzzi's*, 998 F.3d at 1232. That is, "broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Publ'n Paper*, 690 F.3d at 51, 63 (cleaned up); *see, e.g.*, *Petruzzi's*, 998 F.2d at 1232 (giving example of conspiracy to "refus[e] to bid on accounts" in order to allocate customers and raise prices).

In all cases, "[s]ummary judgment is not a substitute for a trial and so if the evidence admits of competing permissible inferences with regard to whether a

plaintiff is entitled to relief, summary judgment should be denied." *Anderson News,*

*L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (cleaned up).

        2.    *Plaintiffs Adduced Sufficient Direct And Indirect*
               *Evidence Of An Agreement To Allocate Customers.*

Plaintiffs provided extensive direct and indirect "plus factor" evidence that

Mylan agreed to allocate customers with its supposed rivals.

*Confessions, Criminal Pleas, and Investigations*. ██████████████

██████████████████  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████  ████████████  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

A "co-conspirator's acknowledgment that he understood his numerous communications with [the defendant] to reflect [an antitrust] agreement . . . is surely strong evidence of a collusive scheme" and "sufficient to satisfy *Matsushita*'s 'tends to exclude' standard." *Publ'n Paper*, 690 F.3d at 64. But in this case, Plaintiffs had even more. For one thing, Glazer's account was collaborated by contemporaneous evidence. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████  ████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████  ███████████████

█████████████████████████

There were also other criminal charges and pleas.  Although not mentioning Mylan specifically, other companies' plea agreements admitted engaging in a broad generic drugs conspiracy without listing all the drugs subject to the agreements.  *See supra* at 9.[18]  Some nonetheless acknowledged allocating markets for several of the drugs at issue in this case.  *See supra* at 10 (Heritage and glyburide); *id*. (Sandoz and benazepril).  By strongly supporting the existence of a conspiracy that Mylan could join, the admissions make Plaintiffs' claims of collusion more plausible, adding to the plus factors in this case.  *See United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985) ("[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.") (citation omitted).

Moreover, that Mylan is the subject of antitrust investigation and civil suits by state law enforcers is an additional plus factor in itself.  *See Starr v. Sony BMB Ent.*, 592 F.3d 314, 324 (2d Cir. 2010).

---

[18] The plea agreements do not identify unindicted co-conspirators by name, but rather use generic terms (*e.g.*, "co-conspirators") or pseudonyms (*e.g.*, "Company A").  *See* Exs.(1631at3-4)(1632at3-4)(1702at1-2, 18-20).

***Fifth Amendment Pleas.*** 

A jury could reasonably infer from these invocations that the truthful (and incriminating) answer would have been "yes." *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (civil juries may draw adverse inferences from invocations of Fifth Amendment); *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 172 (2d Cir. 2019) ("[T]he fact that several former Alavi board members refused to testify makes it more probable that their testimony would have harmed the Claimants' interests."); *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) ("[E]x-employees' refusals to testify" in civil case against former employer "could appropriately be conceptualized as 'vicarious admissions of their former employer.'") (citation omitted).

Relying on the inference to allow the case to proceed forward is particularly appropriate in this circumstance, where the Mylan officials' refusal to answer legitimate questions going to the heart of this case deprived Plaintiffs of some of the most direct and probative evidence of conspiracy available.

***Interfirm Communications***.    The inference of an agreement is further supported by the "evidence of a high level of interfirm communications." *Apple*, 791 F.3d at 315 (citation omitted). ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

In this case, Plaintiffs did not simply show a "high *level* of interfirm communication," *Apple*, 791 F.3d at 315 (emphasis added) (citation omitted), but also that the *timing* and *content* of that communication strongly supports an inference of collusion. ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████ ███████████ ██████████████

████ ██ █ ██ █ █ ██ ███ ██ ██ ██ ██

███████████ ██████████████ ████████

████████████████████████████████████████████

The inference of collusion is further supported by internal documents. ▮

A reasonable jury could conclude from this evidence that Mylan and Teva had agreed to divide fenofibrate customers between them.





Other emails and phone records, while less direct, still provided a reasonable basis to infer that firms were coordinating their bidding and allocating customers.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ ████████████████ *Publ'n Paper*, 690 F.3d at 65 (advanced communications about competitive moves is "evidence of conspiratorial behavior").

***Conceding Customers Against Self-Interest***. The companies' repeated conceding of customers to each other—sometimes by simply refusing to bid for business, sometimes by placing high bids they knew would be rejected—is also the kind of acts "against apparent individual economic self-interest" recognized as a plus factor suggesting an agreement not to compete. *Apple*, 791 U.S. at 315; *see, e.g.*, *Petruzzi's*, 998 F.3d at 1244-45.

***Motive To Conspire And Market Conditions Conducive to Collusion***.  The allegations of agreement are further made more plausible by Plaintiffs' demonstration that the participants had strong economic incentives to conspire and were operating in a market conducive to such collusion, containing a relatively small number of players who could feasibly coordinate their sales practices.  *See* Exs.(393at¶¶171-73)(394at¶¶23, 124, 394-420); *Apple*, 791 F.3d at 316; *Publ'n Paper*, 690 F.3d at 65.

***Resulting Stable Market Share.***  Finally, Plaintiffs' claims of a market-allocation agreement are supported by the actual market division that arose and remained stable over time.  *See* ¶(1943), Ex.(394at¶300 & Exhibit 9); *Cf. In re Text Messaging Antitrust Litig*., 782 F.3d 867, 876 (7th Cir. 2015) ("Circumstantial evidence [of an anticompetitive agreement] might be inflexibility of the market leaders' market shares over time . . . .").

***Overall Assessment of The Evidence***.  Taken together this evidence is more than ample to "show that the inference of conspiracy is reasonable."  *Matsushita*, 475 U.S. at 588.  The evidence in this case is similar to the record this Court found sufficient in *Publication Paper*.  There, the plaintiffs also pointed to a co-conspirator admission, 690 F.3d at 64; an oligopolistic industry "conducive to collusion," *id.* at 65;[20] and "private phone calls" among high-level officials discussing future

---

[20] *See id*. at 56 (the "publication paper market in North America is an oligopoly").

competitive moves, *id*. This Court acknowledged that "the totality of the evidence admits of alternative interpretations," *e.g.*, that the companies' parallel conduct was "the product of certain characteristics of the industry [*i.e.*, its oligopolistic nature] and not any agreement." *Id.* at 65. But the Court held that "it is the province of the jury to determine how much weight to accord the [co-conspirator] testimony and the other relevant evidence. We believe that, on the basis of [that] testimony alone, a jury could reasonably find . . . an agreement." *Id.* The same is true here.

> 3. *The District Court's Rejection of Plaintiffs' Evidence Was Permeated With Legal Error.*

The District Court reached a different conclusion, but its reasoning is riddled from top to bottom with legal error.

**Heightened Burden**. The Court's entire analysis was infected by its holding that "[t]o survive summary judgment on a Section 1 claim in *the context of an oligopoly*, substantive antitrust law *elevates* a plaintiff's evidentiary burden" and imposes a "substantial burden on the Plaintiff." Op.59, 62 (emphasis added) (cleaned up). The Supreme Court has been clear, however, that there is no "special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Tech. Servs*., 504 U.S. 451, 468 (1992). This Court has emphasized that point in the specific context of antitrust claims in an oligopolistic market, explaining that it "is important not to be misled by *Matsushita*'s statement . . . that the plaintiff's evidence . . . must 'tend . . . to exclude' the possibility that the alleged

conspirators acted independently." *Publ'n Paper*, 690 F.3d at 63 (omissions in original) (citation omitted). Even "if a plaintiff relies on ambiguous evidence to prove its claim," the existence of a conspiracy must simply be "a *reasonable* inference that the jury could draw from that evidence." *Id.* (emphasis added)

Rather than impose a heightened burden, the District Court should have realized that this is a case in which inferences of conspiracy are more readily available. As noted, this Court has held that "broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Publ'n Paper*, 690 F.3d at 51, 63 (cleaned up). Here, the alleged conspiracy "to allocate customers" "made perfect economic sense" and the challenged activities "could not reasonably be perceived as procompetitive." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004) (cleaned up). "After all, refusing to bid on accounts hardly can be labeled as the 'very essence of competition.'" *Id.* (quoting *Matsushita*, 475 U.S. at 594).

***Confessions, Criminal Pleas, and Investigations***. Turning to the evidence, the District Court set aside Glazer's confession solely on the ground that "Glazer himself noted that Mylan's representative at the meeting, Malik, was non-committal" and because, in the Court's view, there was no other evidence showing

Mylan agreed to the proposal.  Op.62.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  ██  ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

In *Publication Paper*, the plaintiffs likewise relied on testimony from a co-conspirator stating that the conspirators "reached an 'agreement'" to raise prices. 690 F.3d at 64.  "Whether or not this testimony . . . admits any ambiguity as to [the defendant's] parallel understanding of the same communications," this Court held, "the testimony is surely strong evidence of a collusive scheme" and "sufficient to satisfy" the summary judgment standard.  *Id.*  Resolving ambiguity in the evidence and making credibility determinations is a job for the jury.

The District Court addressed the co-conspirator guilty pleas only in a footnote, where it wrongly stated that the Sandoz criminal admission "[wa]s specific to certain drugs, none of which [we]re challenged here." Op.66 n.22. In fact, Sandoz admitted to conspiring broadly "to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, *generic drugs* sold in the United States," including specifically benazepril HCTZ, one of the drugs at issue here. Ex.(1702) (emphasis added).[21] More importantly, a jury could reasonably view evidence of a wide-spread conspiracy in the generics industry – shown not only by the Sandoz plea, but by the pleas of four other competitors the District Court did not even acknowledge – as important support for the other evidence that the conspiracy extended to the drugs and parties at issue in this case.

***Fifth Amendment Pleas***. The District Court discounted the Fifth Amendment pleas for two reasons. *First*, it claimed that Plaintiffs did not "articulate what the specific questions where or in what manner they would be probative of the existence of agreements to allocate a specific market or fix the prices for a specific drug." Op.56 n.20. █████████████████████████████████████████

---

[21] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

[REDACTED]

*Second*, the Court stated that "drawing an adverse inference based on" the Fifth Amendment invocation "and nothing more, is impermissible; corroboration is required." Op.62 n.21 (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)). But Plaintiffs are not seeking to impose final liability on Mylan based on this (or any other) evidence; the question is simply whether there is sufficient evidence to go to trial, a question the footnote in *Lefkowitz* does not address. In any event, there was plenty of corroboration, [REDACTED]

[REDACTED]

What inference to draw from the Fifth Amendment invocation is ultimately a question for the jury at trial. *See In re 650 Fifth Avenue*, 934 F.3d at 172. At the summary judgment stage, the court was required to draw inferences from Fifth Amendment invocations in favor of the non-moving party. *Stichting Ter Behartiging v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005).

***Interfirm Communications.*** The District Court dismissed the extensive evidence of interfirm communication as "only information sharing between rivals in an oligopolistic market, which courts have consistently held to be insufficient, standing alone, to establish Section 1 liability in that context." Op.62-63.

But, again, Plaintiffs are not pointing to the interfirm communications "standing alone," much less as a basis "to establish Section 1 liability." They are relying on it to establish a "plus factor" sufficient (along with other evidence) to allow a jury to decide whether Section 1 liability has been established. *That* use is firmly established as appropriate. *See supra* at 30.

The District Court's suggestion that high levels of interfirm communications are not probative in an oligopoly setting is equally unfounded. Firms in concentrated markets have no greater need or justification for communicating with rivals than firms in markets with more competitors. Indeed, they have *less* reason to communicate, even if they are intent on pursuing conscious parallelism, because they can simply observe each other's moves and follow them. *See* Op.67-68. That these firms nonetheless were in constant communication strongly suggests that they were not content to simply follow the leader but were bent on reaching actual agreements.

This is hardly surprising given that the conspirators were dividing customers and markets, not simply raising prices. The theory of oligopolistic behavior the

District Court relied on was developed in price-fixing cases, where one firm sometimes can "lead" a price increase with little risk (it can easily take it back), and others will see it and have an incentive to follow (knowing that if they all do, the increase will stick, making them all better off, and knowing that if the increase doesn't stick, they can all go back to the lower price). *See* Op.67-68. That theory does not work for market allocation. The District Court offered no explanation on how competitors can decide which firms will serve which customers simply by observing each other's behavior.

The Court also erred in ignoring that the interfirm communications here were not idle "shop talk" among low-level "field sales representatives." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999). The communications involved private, direct communications between company CEOs and Presidents, Vice Presidents and other top sales employees. *See supra* at 10. Nor did Plaintiffs' evidence simply show companies monitoring publicly available information about their competitors. *Cf. id.* at 126 ("Gathering competitors' price information can be consistent with independent competitor behavior."). The conspirators reached out to each other specifically to discuss their plans for competing for customers. *See supra* at 11.

Nonetheless, relying on a Third Circuit case, the District Court held that "these sorts of communications are *immunized from Section 1 liability* because

'communications between competitors do not permit an inference of an agreement to fix prices unless "'those communications rise to the level of an agreement, tacit or otherwise.""" Op.64 (quoting *Baby Food*, 166 F.3d at 125) (emphasis added). But all the Third Circuit said was that communications, *standing alone*, are not unlawful and are insufficient *without more*, to prove a conspiracy.[22] Plaintiffs do not argue otherwise, but simply point to the interfirm communications as a plus factor that, together with other evidence, would allow a reasonable jury to infer an agreement.

This Court has made perfectly clear this use is appropriate, even in oligopoly cases. In *Publication Paper*, the Court held that among the "most notabl[e]" "evidence of conspiratorial behavior" in that oligopolistic industry was "private phone calls and meetings" in which company officials "disclosed to each other their companies' intentions to increase prices before those decisions had been publicly announced." 690 F.3d at 65.

***Conceding Customers Against Self-Interest And The Resulting Stable Market Division.*** The District Court held that actions against self-interest are "irrelevant in an oligopoly case" because they "restate the phenomenon of

---

[22] ██████████████████████████████████████████████████
██████████████████████████████████████

interdependence." Op.63 (quoting *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 193 (2017)). That is incorrect as well.

In *Petruzzi*'s, the Third Circuit acknowledged the line of thought the District Court relied on, but explained those "concerns are not germane here because we are not dealing with parallel pricing. Rather, we are dealing with refusals to bid on existing accounts as aggressively as new accounts." 988 F.2d at 1244. As in this case, the defendants "justified their behavior by arguing that they did not want to induce a price war or retaliation." *Id.*; *see* Op.61. But the Third Circuit rejected that excuse, explaining that "the defendants' argument makes no sense" and that "absent an agreement it does not make economic sense for defendants not to bid on an account." *Petruzzi's*, 998 F.3d at 1245. Unlike price-following, the decision to cede customers to a competitor is not easily taken back and extremely costly if the hoped-for reciprocation does not materialize. And even if Mylan genuinely wanted to avert a "turf war"—competition antitrust laws encourage—it is hard to see how it could placate its competitors, yet remain profitable, by blindly ceding accounts to rivals without any actual negotiations or agreement about what turf division would satisfy everyone. As a leading antitrust treatise teaches, "refusal to bid in oligopoly situation . . . cannot be sustained without some enforcement mechanism." *Id.* at 1246 (citing VI Areeda, *Antitrust Law* ¶ 1420d, at 123-24). The willingness to cede

customers in this case, along with the stable division of the market over time, *see supra* at 39, strongly suggests that an actual agreement was reached.

The District Court noted that antitrust law does not impose a duty to compete. Op.61. But it does prohibit *agreeing* not to compete. And as *Petruzzi's* rightly held, in the absence of any convincing explanation, a defendant's refusal to compete for customers can support an inference of collusion.

Finally, the Court stated that "Plaintiffs experts on this issue acknowledged that conceding market share to opponents or choosing not to fill some sales opportunities *can* be entirely consistent with a firm's unilateral self-interest." Op.52 (emphasis added). ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████ In requiring "plaintiff to 'exclude' or 'dispel' the possibility of independent action," the Court imposed "too heavy a burden." *Publ'n Paper*, 690 F.3d at 63.

***Court's Overall Assessment of the Evidence.*** The Court repeated its errors throughout the opinion as it marched through the evidence regarding each of the 21 drugs for which it permitted Plaintiffs to submit proof. Op.61-67. Over and again,

the Court wrongly rejected Plaintiffs' plus factors as legally irrelevant,[23] dismissed them for failing to *compel* an inference of collusion when Defendants had offered a plausible alternative explanation,[24] or made inferences in Mylan's favor.[25]

The Court's atomization of the evidence was particularly wrong and damaging. *See Apple*, 791 F.3d at 319 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."). The Court went through the evidence regarding each of the 21 drugs, finding that proof insufficient for each one without acknowledging that the evidence of collusion regarding one drug was probative of collusion on the others. *See* Op.62-67. Even assuming (wrongly) that the evidence on some drugs was insufficient in isolation, it is one thing for Mylan to engage in suspicious (if not irrefutably collusive) conduct with respect to one product; it is quite another for that suspicious evidence to arise with respect to more than twenty related products. The Court magnified its error by refusing altogether to consider the probative value of

---

[23] Op.61, 63, 64.

[24] *Id*. 61-62, 64.

[25] *Id*. 62-63 (treating interfirm communications as innocent "information sharing"); *id*. 65 (same); *ibid*. (construing evidence that Teva employee knew Mylan market share targets as showing he was "an effective Teva employee" rather than one who had inside information); *ibid*. (rejecting evidence of interfirm communication because it was "not evident what the content of the conversation was"); *id*. 66 (giving innocent interpretation to plausibly incriminating statements); *id*. 67 (rejecting evidence of planned coordination because it ultimately did not occur).

evidence of collusion regarding drugs it excluded from its list of 21.[26]  But, again, proof of a widespread conspiracy to fix prices and allocate markets for generic drugs *generally* is powerful supporting evidence that the conspirators did not exclude from the conspiracy the drugs at issue in this case.

Having siloed Plaintiffs' evidence and declared each piece insufficient without the others,[27] the Court erred in finding that all the evidence together insufficient because each part was individually rejected.[28]  Were this Court to condone this kind of analysis, it would effectively license outright agreement to allocate markets and fix prices among all but the most incompetent oligopolists.

### C.    Plaintiffs Adduced Sufficient Evidence Of An Agreement To Fix Prices.

For many of the reasons already discussed, Plaintiffs also provided sufficient evidence to allow a reasonable jury to conclude that the conspiracy included an agreement to fix prices.  The District Court did not dispute that the record shows that Mylan increased prices in parallel with its co-conspirators.  *See* Op.67-68.  At the same time, most of the plus-factors discussed above apply equally to the price-fixing claims.   The guilty pleas, co-conspirator confessions, and Fifth Amendment

---

[26] *See* Op.54-55, 66 n.22.

[27] *Id*. 62 (Glazer confession); *id*. 64, 67 (conceding customers); *id*. 65-66 (rejecting evidence of communications because it did not definitively prove collusion).

[28] *Id*. 61-62.

invocations all involved both the customer-allocation and price-fixing schemes.[29]

Price increases above marginal costs are typically contrary to a firm's economic self-interest in the absence of an agreement. *See, e.g.*, *Starr*, 592 F.3d at 324. And the market structure for generic drugs is just as conducive to price-fixing as market allocation. 

Plaintiffs also presented evidence specific to the price-fixing claims that strongly supports an inference of agreement.

---

[29]

[30]

[31]



The extraordinary price increases for many drugs also stopped when the government investigations started, "strengthening substantially the inference that a conspiracy existed." *Alaska Electr. Pension Fund v. Bank of Am. Corp*., 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016); *see* ¶(1966), Ex.(394atExhibit 3A).

Even if ordinary parallel pricing is inconclusive, such extraordinary, unprecedented, and unexplained price hikes are different. *See Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (an inference of collusion can arise from "historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason") (quoting *Twombly*, 550 U.S. at 556 n.4). As discussed, a firm in an oligopoly might raise prices a modest amount in the hopes that others will follow because in most markets, the increase can be taken back if not followed, without significant cost or risk. Huge price increases, on the other hand, risk significantly alienating customers, with longer-term consequences. ███████

██████████████████████████████████████████████

████████████████████████████████████  ████████████

████████████████████████  At the same time, the prospect of an extraordinary price hiking

sticking without agreement is also low—as competitors will fear the wrath of *their*

customers and the opportunity to gain market share, even while raising prices

materially, would be tempting.  For all these reasons, the District Court erred in

assuming, effectively as a matter of law, that a seller in this kind of market would

dramatically increase prices without an agreement that its competitors will, too.

The District Court dismissed the price-fixing evidence in a few sentences,

suggesting that the Supreme Court has held price-fixing all but immune from

antitrust challenge in an oligopoly.  *See* Op.68.  But this Court has denied summary

judgment in oligopoly price-fixing cases on the basis of similar evidence (*e.g.*, co-

conspirator testimony and interfirm communications) even when the price increases

themselves were unremarkable.  *See Publ'n Paper*, 690 F.3d at 56, 64-65; *supra* at

48.

To the extent the District Court suggested that Plaintiffs' claims were

impermissibly based on an analysis of list prices, rather than actual prices charged,

*see* Op.68 (citing *Brooke Grp. Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S.

209, 236 (1993)), it misread both the Supreme Court case it cited and the record.

The reason the Supreme Court found inferences from list prices to be unreasonable

in *Brooke* was that various discounts "reduced the actual cost . . . to consumers below list prices." *Brooke*, 509 U.S. at 236. 

No evidence in the record suggests that any discounts were taken off of this pharmacy invoice pricing.

### D. Plaintiffs Adduced Sufficient Evidence On Loss Causation.

The District Court also wrongly entered summary judgment in Mylan's favor on loss-causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (cleaned up). "Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

A "plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (citation omitted). To prove materialization of a risk, plaintiffs may show that a "misstatement or omission concealed *something* from the market that, *when*

*disclosed*, negatively affected the value of the security." *Id*. at 261-62 (citation omitted). Where the truth concealed by the fraud is a business *risk* (*e.g.*, the risk of bankruptcy in *Vivendi*), it is sufficient that the company's stock price fell as news "leak[ed] out" revealing that risk, even if the risk "concealed in [the] material misstatement never ripens from a mere risk to an out-and-out disaster." *Id*. at 261-62 (citation omitted).

Here, Mylan's misstatements concealed the risk that it could be subject to expensive and damaging antitrust investigations or suits and that its seemingly lucrative business model (upon which its valuation was based) was unsustainable, resting in material part on a conspiracy that could be broken up by law enforcement or fall apart on its own at any time. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

November 3, 2016. On November 3, 2016, Mylan's stock price fell when *Bloomberg* reported new facts about the DOJ's antitrust investigation into Mylan and the generic drug market, based on information from confidential informants. Ex.(496at¶¶101-03). The District Court did not doubt that Mylan stock fell because of this news (Defendants failed to identify anything else causing it). But it dismissed the price movement because, it said, the article failed to disclose "anything 'new.'"

Op.73.  Not so.  Although the existence of an investigation had previously been disclosed, the article newly reported that DOJ had found the allegations of collusion substantiated and was on the verge of bringing criminal (not merely civil) cases against drug companies.  The article also newly reported on that scope of the investigation had increased and "now span[ed] more than a dozen companies and about two dozen drugs." ███████████

Accordingly, while Mylan investors may have previously devalued the stock to some degree upon learning there was an investigation,[36] they reasonably viewed the news that the investigation was heading toward indictments, and had expanded in scope, as showing that the risk to Mylan was materially greater than previously revealed.  In *Vivendi*, where the defendant misled investors about the "risk of a liquidity crisis," this Court found loss causation proven by stock market reaction to multiple events showing company was in financial distress, even though one could say that earlier events had already disclosed that risk to some degree.  838 F.3d at 261-63.  Likewise, here, the market's reaction to news making it increasingly likely that Mylan would suffer the harms its omissions concealed is sufficient to show that the misrepresentations were the "cause of the actual loss suffered."  *Id*. at 263 (citation omitted).

---

[36] Plaintiffs were unable to sufficiently disaggregate the effect of that news from other confounding factors, Exs.(373at315:13-23)(496at¶¶101, 107), and so do not rely on it to prove loss causation here.

January 11, 2017. One risk of anticompetitive conduct is that it may prove unsustainable, leading to a marked devaluation of the company when the risk or reality of government scrutiny brings it to an end. That risk was revealed here when, in early 2017, President Trump called for "new bidding procedures for the drug industry," as pharmaceutical companies were "getting away with murder" by charging supracompetitive drug prices. ¶(2307), Exs.(496at¶108)(1681). Mylan's CEO, hoping to forestall the proposed regulation, suggested that Mylan and others in the industry would change their ways on their own. "If anyone is walking away . . . thinking business as usual," she said, "that is a mistake . . . . We've got to re-look at the model by which the industry prices drugs." ¶¶(2308-09), Exs.(496at¶109)(1682).

The only reason the District Court gave for rejecting this proof was that President Trump did not single out *generic* drugs or reference Mylan or any of its drugs by name. Op.72-73. But a jury could reasonably find that the market was reacting to *Mylan*'s response to the comments—indicating it was seriously reconsidering the pricing made possible by the conspiracy—not to "posturing by politicians." *Id.*

October 31, 2017. In October 2017, the Connecticut attorney general filed a proposed amended complaint in the suit by state attorneys general against Mylan and other generic drug companies. ¶(2312), Ex.(496at¶115)(1626). The complaint

newly implicated Mylan's President Defendant Malik by name in the Doxy DR scheme. ¶¶(2313-14), Ex.(496at¶115)(1626).

The District Court found that no reasonable juror could find loss causation based on the decrease in Mylan's stock price after this news because "[Plaintiffs] do not have an expert opinion or other evidence that [the] revelation [that Defendant Malik was named as a conspirator] is what moved the market." Op.75. The District Court was mistaken. Plaintiffs' expert report and testimony expressly made this point. ¶2318, Exs.(496at¶121) (373at330:24-331:6, 332:3-8, 336:6-16, 337:6-12.). Moreover, analysts viewed the revelation of Malik's involvement as material news about the Company. Ex.(496at¶118). One analyst stated, for example, that he was "not particularly surprised to see the investigation broaden . . . but it has now specifically targeted Mylan's president and executive director, Rajiv Malik, which may potentially expose this company to greater scrutiny." ¶(2315), Exs.(496at¶118)(1689).

May 13, 2019. In May 2019, the Connecticut attorney general filed a second lawsuit, expanding the scope of the generic drug litigation to over 100 generic drugs. ¶¶(2320-21), Exs.(496at¶124)(526). The complaint implicated Mylan in collusion regarding numerous additional drugs, including for the first time, levothyroxine, which generated the most revenue of any of Mylan's generic drugs. ¶¶(2320-25), Ex.(496at¶¶124-28). The investigation likewise named Defendant Nesta for the first

time as a central participant in the conspiracies. ████████████████

████████████████████████████████████████████████████

████████████████████████████████

The District Court nonetheless held the event irrelevant because the new complaint concerned only drugs with respect to which the Court already had held that Plaintiffs had not pleaded an antitrust conspiracy. Op.76-77. That holding was wrong as well.

*First*, the District Court did not dismiss Plaintiffs' allegations regarding levothyroxine. *See* MTD Op. III 1-2 n.1; TACat¶318.

*Second*, even setting that aside, the expanded scope of the investigation and the extensive participation of Defendant Nesta in the scheme made the prospect that Mylan would face penalties and regulatory scrutiny more likely.

*Third*, as discussed earlier, the District Court erred in limiting Plaintiffs' proof to evidence directly relating to 21 specific drugs in the first place. *See supra* at 51. Because Mylan's misstatements were not specific to any particular product, any revelation that made it more likely to the market that Mylan was engaged in collusive conduct was a partial revelation of the misleading nature of these statements. Indeed, disaggregation between drugs is particularly inappropriate because the losses largely represented general reputational harm—████████████████████████

████████████████████████████████████████████████████

### III. REASONABLE JURORS COULD FIND SECTION 20(A) LIABILITY.

The District Court identified no reason for dismissing Plaintiffs claims against the individual defendants under Section 20(A)'s control person liability provisions other than its rejection of the underlying claims of securities violations. *See* Op.2 n.1. Because that rejection was erroneous, the claims against the individual defendants must be reinstated as well.

### CONCLUSION

The District Court's opinion granting Appellees' motion for summary judgment should be reversed as argued above, and Appellants' motion for partial summary judgment should be granted.

Dated:  August 9, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Tel.:  (212) 661-1100
Fax:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

GOLDSTEIN, RUSSELL &
WOOFTER LLC

Kevin Russell
1701 Pennsylvania Ave. NW
Suite 200
Washington DC 20006
(202) 240-8433 (main)

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because the brief contains 13,766 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. Ap. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: August 9, 2023

New York, New York

By: */s/ Austin P. Van*
Austin P. Van