PUBLIC REDACTED VERSION

# 23-0720

## United States Court of Appeals
## for the Second Circuit

───────────

MENORAH MIVTACHIM INSURANCE LTD., *et al.*,

*Movants-Appellants,*

v.

MYLAN N.V., *et al.*,

*Defendants-Appellees.*

(Full caption commences on inside cover)

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

═══════════

### FINAL FORM BRIEF OF DEFENDANTS-APPELLEES

═══════════

| | |
|---|---|
| Lenard Barrett Boss | David R. Marriott |
| Joseph Dever | Rory A. Leraris |
| Matthew L. Elkin | CRAVATH, SWAINE & MOORE LLP |
| COZEN O'CONNOR P.C. | Worldwide Plaza |
| 3 World Trade Center | 825 Eighth Avenue |
| 175 Greenwich St., 55th Fl. | New York, NY 10019 |
| New York, NY 10007 | (212) 474-1000 |
| (212) 509-9400 | |

*Attorneys for Defendant-Appellee
James Nesta*

*Attorneys for Defendants-Appellees
Mylan N.V. and Mylan Inc.,
Heather Bresch, Paul B. Campbell,
Robert J. Coury, Rajiv Malik,
Kenneth S. Parks and John D.
Sheehan*

MENORAH MIVTACHIM INSURANCE LTD., MENORAH MIVTACHIM PENSIONS AND
GEMEL LTD., PHOENIX INSURANCE COMPANY LTD., MEITAV DS PROVIDENT FUNDS
AND PENSION LTD.,

*Movants-Appellants,*

STEF VAN DUPPEN, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED,
LANDON W. PERDUE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

*Plaintiffs,*

v.

JOHN D. SHEEHAN,

*Defendant-Consolidated-Defendant-Appellee,*

HEATHER BRESCH, ROBERT J. COURY, PAUL B. CAMPBELL, KENNETH S. PARKS,
MYLAN N.V., MYLAN INC.,

*Consolidated-Defendants-Appellees,*

RAJIV MALIK, JAMES NESTA,

*Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants-Appellees Mylan N.V. and Mylan Inc. certify the following: Mylan Inc. is a wholly owned subsidiary of Viatris Inc., a publicly held corporation. Mylan N.V. was formerly the parent company of Mylan Inc., but ceased to exist upon the closing of a business combination of Mylan N.V. and Upjohn Inc., subsequently renamed Viatris Inc. Viatris Inc. does not have a corporate parent and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

GLOSSARY OF TERMS ..................................................................ix

COUNTERSTATEMENT OF THE ISSUES ........................................1

STATEMENT OF THE CASE ............................................................2

    A.    The Parties ........................................................................3

    B.    This Litigation ...................................................................4

    C.    The Claims in Suit ..............................................................4

    D.    Summary Judgment Decision .................................................6

    E.    This Appeal .......................................................................6

SUMMARY OF THE ARGUMENT ....................................................8

STANDARD OF REVIEW ..............................................................10

ARGUMENT ................................................................................11

I.    THE DISTRICT COURT PROPERLY DISMISSED THE ONLY MDRP CLAIMS AT ISSUE ON THIS APPEAL. ........................................11

    A.    Plaintiffs Failed To Challenge the District Court's Scienter Rulings, Which Are Independently Dispositive. ...............................11

    B.    The District Court Properly Dismissed the MDRP Claims for Multiple Independent Reasons. .............................................13

    C.    Plaintiffs Cannot Demonstrate Loss Causation. ..................21

II.    THE DISTRICT COURT PROPERLY DISMISSED THE GENERIC DRUG CLAIMS. ........................................................................23

    A.    Plaintiffs Cannot Show a Materially False or Misleading Statement. ......................................................................23

B.      Plaintiffs Failed To Adduce Evidence Sufficient To Show
        Scienter. ................................................................................54

C.      Plaintiffs Cannot Demonstrate Loss Causation. ..................................56

III.    THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS'
        CASE AGAINST THE D&O DEFENDANTS. ...........................................63

CERTIFICATE OF COMPLIANCE ........................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed. of State, County and Mun. Empls. Dist. Cncl. 37 Health &
  Security Plan, et al. v. Mylan Inc., et al.*,
  No. 16-md-2724 CMR (E.D. Pa.) (filed Aug. 15, 2017)....................................62

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................10

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ...........................................................................28

*Avirgan v. Hull*,
  932 F.2d 1572 (11th Cir. 1991) .................................................................31, 34

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................................15

*Beckford v. Portuondo*,
  234 F.3d 128 (2d Cir. 2000) ...........................................................................10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................36

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)..........................................................................27, 44, 49

*Caldarola v. Calabrese*,
  298 F.3d 156 (2d Cir. 2002) ...........................................................................10

*Casciani v. Nesbitt*,
  392 F. App'x 887 (2d Cir. 2010) .....................................................................58

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) ...........................................................................10

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000) ...................................................................32, 33

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................11

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
   826 F. Supp. 2d 705 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir.
   2012) .....................................................................................40

*Fujitsu Ltd. v. Fed. Express Corp.*,
   247 F.3d 423 (2d Cir. 2001) ..........................................................10

*George v. Reisdorf Bros., Inc.*,
   410 F. App'x 382 (2d Cir. 2011) .....................................................25

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal
   Bank of Scotland Grp., PLC*,
   783 F.3d 384 (2d Cir. 2015) ...........................................................53

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ......................................................27, 36

*In re DNTW Chartered Acct. Sec. Litig.*,
   666 F. App'x 78 (2d Cir. 2016) .......................................................63

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) (per curiam) ...........................................30

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ......................................................37, 45

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F.Supp. 3d 430 (S.D.N.Y. 2017) ................................................36

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...........................................................59

*In re Publication Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2016) .............................................................41

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ..........................................................39

*In re Zinc Antitrust Litig.*,
    155 F.Supp. 3d 337 (S.D.N.Y. 2016) ...................................................36

*Lefkowitz v. Cunningham*,
    431 U.S. 801 (1977)........................................................................31

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997) ............................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................41

*Mayor of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ............................................................38

*McCarthy v. S.E.C.*,
    406 F.3d 179 (2d Cir. 2005) ......................................................13, 23

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ......................................................17, 18

*Newport News Holding Corp. v. Virtual City Vision, Inc.*,
    650 F.3d 423 (4th Cir. 2011) ..........................................................39

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir. 1998) ......................................................13, 23

*Noto v. 22d Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ..............................................................17

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ..........................................................39

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019)...............................................17

*Quarles v. Gen. Motors Corp.*,
    758 F.2d 839 (2d Cir. 1985) ...........................................................52

*Reiss v. Pan Am. World Airways, Inc.*,
    711 F.2d 11 (2d Cir. 1983) .............................................................11

vi

*Strougo v. Barclays PLC*,
    334 F. Supp. 3d 591 (S.D.N.Y. 2018) ...................................................64

*The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.*,
    No. 18-cv-284 CMR (E.D. Pa.), ECF 1 (filed Jan. 22, 2018) ...........................62

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ...............................................................41

*United States v. Botti*,
    711 F.3d 299 (2d Cir. 2013) ...............................................................18

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008) ...............................................................30

*United States v. Wilkinson*,
    754 F.2d 1427 (2d Cir. 1985) .............................................................30

*Valassis Comm'cns, Inc. v. News Corp.*,
    No. 17-cv-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)................40

*Valenti v. Penn. Mut. Life Ins. Co.*,
    850 F. Supp. 2d 445 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir.
    2013) ............................................................................................34

*Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ..........................................................37, 43

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ................................................................10

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)...............................................................38

*Wilson v. Reuben H. Donnelley Corp.*,
    No. 98 CIV. 1750 (AGS), 1998 WL 770555 (S.D.N.Y. Nov. 2, 1998)..............34

## Statutes & Rules

17 C.F.R. § 240.10b-5.................................................................4, 63, 64

42 U.S.C.A. § 1396r-8(c)(3) (2010) .......................................................14

42 U.S.C. § 1396r-8(c) .................................................................5

*Antitrust Law* ¶ 1434(c)(1) (3d ed. 2007) .................................38

§ 10(b) of the Exchange Act ...............................................4, 63, 64

§ 14(e) of the Exchange Act ...............................................4

§ 20(a) of the Exchange Act ...............................................4

Fed. R. Civ. P. 56(c) .........................................................10

Local Fed. R. Civ. P. 56.1 ...............................................33

Sherman Act of 1890, 15 U.S.C. §§1–7 ...........................24, 25

# GLOSSARY OF TERMS

| | |
|---|---|
| "Alleged Market-Allocation Drugs": | Capecitabine, Clonidine, Doxy DR, Fenofibrate, Tolterodine and Valsartan |
| "Alleged Price-Fixing Drugs": | Albuterol, Amiloride, Benazepril, Clomipramine, Divalproex, Doxazosin, Ketorolac, Levothyroxine, Loperamide, Methotrexate, Nadolol, Propranolol, Tizanidine and Trifluoperazine |
| "At-Issue Drugs": | Alleged Market-Allocation Drugs and Alleged Price-Fixing Drugs, collectively |
| "AMP": | Average Manufacturer's Price |
| "Answer": | Defendants' Answer to Plaintiffs' Complaint |
| "Br.": | Confidential Proof Brief for Movants-Appellants |
| "Class Period": | February 21, 2012 to May 24, 2019, both dates inclusive |
| "CMS": | Centers for Medicare and Medicaid Services |
| "CSOF": | Class Representatives' Statement Pursuant to Local Civil Rule 56.1 in Support of Their Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment |
| "Decision": | In re Mylan N.V. Securities Litigation, 16-CV-7926 (JPO) (S.D.N.Y. Mar. 30, 2023) |
| "Defendants": | Mylan and the Individual Defendants |
| "D.Ex.": | Defendants' Exhibit |
| "D&O Defendants": | Heather Bresch, Paul B. Campbell, Robert J. Coury, Rajiv Malik, Kenneth S. Parks, John D. Sheehan |

| | |
|---|---|
| "EpiPen-Antitrust Claims": | Allegations that Mylan offered rebates for its drug, EpiPen, to exclude a competitor |
| "FDA": | U.S. Food and Drug Administration |
| "I Drug": | Innovator multiple source drug, a multiple source drug that was originally marketed under an original new drug application approved by the FDA, 42 U.S.C. § 1396r-8(k)(7)(A) (1997) |
| "Individual Defendants": | Heather Bresch, Paul B. Campbell, Robert J. Coury, Rajiv Malik, James Nesta, Kenneth S. Parks, John D. Sheehan |
| "MSJ.Br.": | Defendants' Motion for Summary Judgment |
| "MTDOp.I": | Motion to Dismiss Opinion I, ECF No. 69, filed 3/28/2018 |
| "MTDOp.II": | Motion to Dismiss Opinion II, ECF No. 102, filed 3/29/2019 |
| "MTDOp.III": | Motion to Dismiss Opinion III, ECF No. 140, filed 4/05/2020 |
| "Mylan": | Mylan N.V. and Mylan Inc. |
| "N Drug": | Non-innovator multiple source drug, a multiple source drug that is not an innovator multiple source drug, 42 U.S.C. § 1396r-8(k)(7)(A) (1997) |
| "Op.": | Opinion |
| "Opinion": | In re Mylan N.V. Securities Litigation, 16-CV-7926 (JPO) (S.D.N.Y. Mar. 30, 2023) |
| "Opp.": | Defendants' Reply ISO Rule 56.1 Statement of Facts |

| "Opp'n.": | Plaintiffs' Memorandum of Law in Support of Class Representatives' Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment |
| --- | --- |
| "PBMs": | Pharmacy Benefit Managers |
| "P.Ex.": | Plaintiffs' Exhibit |
| "Plaintiffs": | Lead Plaintiffs' Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance Company Ltd., Meitav DS Provident Funds and Pension Ltd. on behalf of a class of all purchasers of Mylan N.V. common stock in the United States |
| "P.MTDI": | Plaintiffs' Motion to Dismiss I, ECF No. 45, filed 5/30/2017 |
| "P.MTDIII": | Plaintiffs' Motion to Dismiss III, ECF No. 123, filed 7/31/2019 |
| "Relevant Period": | Class Period |
| "RCSOF": | Reply in Support of Defendants' Local Rule 56.1 Statement of Facts |
| "RSOF": | Defendants' Responses to Plaintiffs' Rule 56.1 Counterstatement of Fact |
| "S Drug": | Single source drug, a covered outpatient drug that is produced or distributed under original new drug applications approved by the FDA, 4.2 U.S.C. § 1396r-8(k)(7)(A)(1997) |
| "SOF": | Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 in Support of Defendants' Motion for Summary Judgment |

| "TAC": | Third Amended Complaint, ECF No. 114, filed 6/17/2019 |
| "WAC": | Wholesale Acquisition Cost |

## COUNTERSTATEMENT OF THE ISSUES

1.     *MDRP Claims.*  Whether:  (a) Plaintiffs' failure to appeal the district court's scienter rulings is independently dispositive; and (b) the district court properly dismissed Plaintiffs' claims because they failed to adduce evidence sufficient to show (i) a material misstatement, (ii) scienter, or (iii) loss causation.

2.     *Generic Drug Claims.*  Whether the district court properly dismissed Plaintiffs' claims and they failed to adduce evidence sufficient to show (i) a material misstatement, (ii) scienter, or (iii) loss causation.

3.     *Section 20(a) Claims.*  Whether the district court properly dismissed Plaintiffs' claims because they failed to adduce evidence sufficient to show either (i) a primary violation or (ii) "culpable participation" (in such a violation) by any D&O Defendant.

## STATEMENT OF THE CASE

This is a securities case in which Plaintiffs threw mud at the wall in the hope some might stick. None did.

Plaintiffs cobbled the case together by borrowing allegations from other lawsuits against, and investigations concerning, Mylan and dressing them up as claims for securities fraud. The crux of the case is that Mylan (and certain officers and employees) allegedly failed to disclose to shareholders that they offered anticompetitive rebates on the EpiPen, misclassified it for purposes of Medicaid rebates, and fixed prices and allocated markets for certain generic drugs—thus inflating artificially the price of Mylan's stock. Plaintiffs survived several motions to dismiss based on the promise that these allegations would be supported by confidential witnesses and evidence from a pending criminal investigation.

None of that happened.

After nearly seven years of litigation, Plaintiffs' purported confidential witnesses never materialized, and the criminal investigation never resulted in any charges against Mylan. On the contrary, the undisputed evidence showed that Mylan's rebates were pro-competitive, the EpiPen was properly classified for Medicaid purposes, and Mylan acted independently (not as part of a cartel) in marketing and selling its generic drug products. Thus, the district court properly

2

found Plaintiffs' allegations to lack support and entered summary judgment in favor of Defendants.

Plaintiffs do not appeal significant portions of the district court's rulings. The ones they do appeal easily withstand review because Plaintiffs elected not to challenge some of the grounds on which the district court rejected the appealed claims (leaving dispositive rulings unchallenged).  And even if they had appealed all of those rulings, Plaintiffs failed to adduce evidence sufficient to show that (i) Defendants engaged in the alleged misconduct underlying their claims; (ii) Defendants acted with scienter; or (iii) the alleged stock drops were caused by the alleged fraud.  The district court's decision should be affirmed.

### A.    The Parties

During the Relevant Period, Mylan N.V. was a publicly traded company. Mylan entities develop, license, manufacture, market and distribute brand-name and generic pharmaceuticals worldwide.  (A-103¶4.)[1]  These products include EpiPen, as well as thousands of generic drugs.  (A-103-104¶¶6-8.)  The Individual Defendants are Heather Bresch, Paul Campbell, Robert Coury, Rajiv Malik, Kenneth Parks, John Sheehan (the "D&O Defendants") and James Nesta.  (A-104-

---

[1] Citations to the parties' statements of undisputed facts are to both the assertions and supporting evidence cited therein.

3

111¶¶9-47.) Plaintiffs are purchasers of Mylan common stock between February 21, 2012, and May 24, 2019. (A-102-103¶3.)

### B. This Litigation

Plaintiffs filed three complaints from May 18, 2016 to June 17, 2019, culminating in the Third Amended Complaint (the "TAC"). The TAC asserts claims under §§ 10(b), 14(e) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. (TAC¶30.)

Plaintiffs crafted the TAC by copying allegations from three sets of non-securities litigations and/or investigations: (1) litigation accusing Mylan of misconduct in the sale of EpiPen, an auto-injector used to deliver epinephrine (the "EpiPen-Antitrust Claims"); (2) a DOJ investigation concerning the classification of EpiPen for purposes of the MDRP (Medicaid Drug Rebate Program) (the "MDRP Claims"); and (3) litigation/investigations concerning alleged price-fixing and market allocation in the generic pharmaceutical drug industry (the "Generic Drug Claims"). (SPA-128-129.)

### C. The Claims in Suit

Plaintiffs contend Defendants made statements explaining the market, regulatory risk and Mylan's income that were materially misleading because Mylan did not disclose the alleged misconduct underlying each of the EpiPen-Antitrust Claims, MDRP Claims or Generic Drug Claims. (TAC¶¶5-29.)

4

Plaintiffs' EpiPen-Antitrust Claims allege that what Mylan said was materially misleading because it failed to disclose that it offered rebates on EpiPen as part of an unlawful scheme to exclude a competing product from the market. (TAC¶¶12-14.) Plaintiffs also alleged Mylan engaged in anticompetitive conduct by imposing vertical restraints on pharmacy benefit managers ("PBMs"), and by bribing PBMs to eliminate a competitor. (A-325-326.)

Plaintiffs' MDRP Claims are predicated primarily on allegations that Mylan knowingly classified EpiPen as an "N Drug". (TAC¶4.) The MDRP requires drug manufacturers to pay rebates to Medicaid, depending upon a drug's classification: rebates for so-called "S Drugs" and "I Drugs" are higher than rebates for N Drugs. 42 U.S.C. § 1396r-8(c). Plaintiffs also allege that Mylan misrepresented that: (i) EpiPen was rebated at 23% Average Manufacturer's Price ("AMP") (instead of 13% AMP, the rate at which N Drugs are rebated), (ii) a governmental agency had *not* taken a position contrary to Mylan's on EpiPen's classification, and (iii) a government investigation was *not* in progress. (TAC¶¶88-94; Dkt.350 at 1-2.)

Plaintiffs' Generic Drug Claims are predicated on allegations that Mylan entered into agreements with its competitors to allocate the markets for 6 generic drugs (the "Alleged Market-Allocation Drugs") (A-371) and to fix the list prices of

14 others (the "Alleged Price-Fixing Drugs") (collectively, the "At-Issue Drugs") (A-388).[2]

### D. Summary Judgment Decision

Following class certification and extensive discovery, Defendants moved for summary judgment on all of Plaintiffs' claims. (MSJ.Br.1.) Plaintiffs cross-moved for partial summary judgment as to elements of their MDRP Claims. (A-324.)

On March 30, 2023, the district court entered an order granting Defendants' motion and denying Plaintiffs' motion (the "Decision"). (SPA-127.) The court followed four other federal judges in rejecting Plaintiffs' EpiPen-competition allegations; acknowledged that multiple government agencies had found EpiPen was properly classified under the MDRP; and found Plaintiffs' Generic Drug Claims to be unsupported.

### E. This Appeal

Plaintiffs do not appeal the portion of the Decision dismissing their EpiPen-Antitrust Claims. They also do not appeal the dismissal of their primary MDRP Claim: that Mylan knowingly misclassified EpiPen. (Br.19 n.14.) And they do

---

[2] Plaintiffs' appeal refers to 21 drugs, but as the district court observed, Plaintiffs made no effort to offer proof as to one of the 21 drugs, Enalapril. (SPA-181.)

not appeal their primary claims against the Individual Defendants; Plaintiffs make no specific mention of their primary claims against any particular Individual Defendant.

Plaintiffs purport to appeal the portion of the Decision rejecting the remaining MDRP Claims (those as to which Plaintiffs cross-moved for summary judgment) for failure to show falsity and materiality. (Br.17-25.) But they have not appealed the district court's holding that they failed to adduce evidence sufficient to prove scienter as to these claims, a failure that is independently dispositive, foreclosing altogether Plaintiffs' appeal of their MDRP Claims. (Br.24-25; SPA-165-176.)

Plaintiffs also appealed the dismissal of the Generic Drug Claims. However, their arguments as to these claims (and their MDRP Claims) misstate the district court's ruling, misrepresent the undisputed evidence and overlook alternative grounds for affirmance. (Br.25-56.)

Finally, Plaintiffs appeal the dismissal of their Section 20(a) claims but rest entirely on their mistaken arguments regarding primary liability; they fail to mention the undisputed evidence that the D&O Defendants acted in good faith. (Br.62.) Indeed, they fail to mention most of the D&O Defendants at all.

The district court's Decision should be affirmed.

## SUMMARY OF THE ARGUMENT

*MDRP Claims*. Plaintiffs appealed only the district court's rulings with respect to their subsidiary MDRP claims—concerning the applicable rebate rate, a government investigation and whether the government took a "contrary position"—and only with respect to falsity and materiality. They did not appeal any of the district court's rulings that Plaintiffs could not demonstrate scienter; those rulings are therefore final and binding. Because Plaintiffs must prove scienter to prevail on their claims, and because they failed to appeal an adverse ruling on scienter, Plaintiffs have forfeited their MDRP claims.

But even if Plaintiffs had not abandoned their MDRP claims, the district court properly dismissed them. The undisputed evidence showed that (1) Defendants did not make a material misrepresentation about rebate rates under the MDRP, a government investigation or whether the government had taken a contrary position; (2) Defendants did not make any of the challenged statements with scienter; they acted in the good faith belief the statements were true; and (3) the alleged misstatements did not cause the alleged injury.

*Generic Drug Claims*. Like their MDRP Claims, Plaintiffs' Generic Drug Claims fail for multiple independent reasons. The claims turn on the proposition that Defendants engaged in unlawful price fixing and market allocation. They did not. And Plaintiffs failed to adduce evidence permitting a reasonable jury to infer

8

otherwise. Plaintiffs also failed to show that the challenged statements, which concerned Mylan's income and the marketplace generally, were materially false and misleading. The statements were all true and not misleading.

Even if Plaintiffs had shown that Defendants made materially misleading statements, however, Plaintiffs failed to show that Defendants acted with scienter in making them. The undisputed evidence showed that Defendants believed the statements to be true and acted reasonably in making them. Further foreclosing their Generic Drug Claims, Plaintiffs failed to show that the challenged statements caused the alleged losses.

*Section 20(a) Claims*. Plaintiffs' Section 20(a) claims fail because they did not show a primary violation of the securities laws (for the reasons summarized above). But even if they had, these claims fail because Plaintiffs did not offer evidence sufficient to permit a reasonable inference of culpable participation by the D&O Defendants. The undisputed evidence shows they acted in good faith—not with scienter.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40 (2d Cir. 2000). However, "that does not mean that it is [this court's] function to decide motions for summary judgment in the first instance". *Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir. 2000). The Court of Appeals is "dependent on the district court to identify and sort out the issues", and the district court's judgment is "always helpful and usually persuasive". *Id.*

To defeat a motion for summary judgment, Plaintiffs must raise a genuine issue of material fact. Fed. R. Civ. P. 56(c). To do so, Plaintiffs must do more than simply show some metaphysical doubt as to the material facts, *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002), and they may not rely on conclusory allegations or unsubstantiated speculation, *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001). Instead, Plaintiffs "must offer some hard evidence showing that [their] version of the events is not wholly fanciful". *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Summary judgment is appropriate if the evidence produced by Plaintiffs "is merely colorable, or is not significantly probative". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

## ARGUMENT

I.  **THE DISTRICT COURT PROPERLY DISMISSED THE ONLY MDRP CLAIMS AT ISSUE ON THIS APPEAL.**

As stated, Plaintiffs elected to appeal only some of the MDRP Claims and only as to selected elements. These claims founder because (1) Plaintiffs did not appeal the district court's scienter rulings, which are independently dispositive; (2) Plaintiffs failed to offer evidence sufficient to show that any of the statements at issue were materially misleading and made knowingly or recklessly; and (3) Plaintiffs offered insufficient evidence of loss causation.

**A.**  **<u>Plaintiffs Failed To Challenge the District Court's Scienter Rulings, Which Are Independently Dispositive.</u>**

All of Plaintiffs' claims require proof of scienter, *see, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) ("basic elements" of a securities claim include "scienter, *i.e.*, a wrongful state of mind"), the absence of which is a valid ground upon which to grant summary judgment. *Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) (scienter is "an independently dispositive ground[] for summary judgment.").

The district court carefully considered each of Plaintiffs' MDRP Claims and correctly found insufficient evidence of scienter to sustain any of them.

- Regarding Plaintiffs' claim that Mylan misrepresented the MDRP rebate rate for EpiPen, the district court stated that "liability could only exist if [Plaintiffs] established the clarity of textual meaning

sufficiently to also impute knowledge (scienter) to Defendants" and concluded "[t]he record supports no such inference". (SPA-165.) Plaintiffs' contention that the district court "overlooked" this alleged misstatement altogether is incorrect; the court expressly addressed it. (SPA-164.)

- Regarding Plaintiffs' claim that Mylan misrepresented whether the government had taken a "contrary position", the district court concluded that "even if there were some basis for a reasonable inference that this was misleading, it would fail for want of scienter, for reasons also explained previously: Mylan reasonably believed the government had not taken a contrary position regarding the EpiPen's classification." (SPA-178.)

- Regarding Plaintiffs' claim that Mylan misrepresented whether it was subject to a government investigation, the district court concluded that "all of the reasons that Mylan may well have thought it was—and, indeed, reasonably thought it was—in the right regarding how it classified the EpiPen are also reasons why no one at Mylan would have had reason to think the subpoena material. That is, if, as the Court has held, Mylan acted reasonably in its reliance on CMS statements and other communications in determining how to rebate the EpiPen, then there is no reasonable basis for Mylan to have regarded the subpoena material." (SPA-179.)

While Plaintiffs have appealed the district court's rulings concerning the falsity and materiality of the challenged MDRP statements, they have not appealed any of the scienter rulings. Plaintiffs' brief makes no mention of them. Nor does it even use the word "scienter".[3] On the contrary, Plaintiffs expressly state that

---

[3] While Plaintiffs identify one of the "Issues Presented" as "whether Defendants-Appellees knowingly made material misrepresentations" about EpiPen rebate rates, they make no such argument in their brief and offer no evidence to support it. (Br.1, 17-25.)

"[t]he Court's finding that Mylan reasonably believed its rebate was lawful was wrong, but given space constraints, Plaintiffs have *elected not to challenge it on appeal*". (Br.19 n.14 (emphasis added).) Plaintiffs' argument that whether Mylan reasonably believed it was acting lawfully is irrelevant (Br.18-19) disregards the bedrock rule that scienter is an essential element of any claim for securities fraud.

By not appealing (or even addressing) scienter, Plaintiffs have waived and abandoned any argument on the issue. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Because Plaintiffs do not challenge the district court's scienter rulings, their MDRP Claims fail on that basis alone. *McCarthy v. S.E.C.*, 406 F.3d 179, 187 (2d Cir. 2005) (holding that scienter is an "independent ground of decision [that] must be expressly challenged on appeal.").

**B. The District Court Properly Dismissed the MDRP Claims for Multiple Independent Reasons.**

Even if Plaintiffs had not waived their MDRP Claims by failing to appeal an adverse ruling on an indispensable element (scienter), the district court's dismissal of the claims should be affirmed for multiple independent reasons.

**1. *Plaintiffs' claim about rebate rates is baseless.***

Plaintiffs contend the district court failed to address their allegation "that Mylan had informed the market that it was rebating EpiPen at the maximum statutory rate of 23%, when in fact it was applying a dramatically lower 13% rate".

13

(Br.17.) On the contrary, the district court expressly identified this claim and spent 13 pages discussing it and related issues.[4] (SPA-164-176.) Thus, Plaintiffs' lead argument fails out of the gate.

In any case, Plaintiffs' claim is based on a misrepresentation of Mylan's statement. Contrary to Plaintiffs' contention, Mylan never stated that EpiPen was rebated at 23%. (A-124-125¶115.) Rather, it made a general statement that drugs approved under an NDA are generally rebated at 23%, which was true. (*Id.*) Mylan did not state that there are no circumstances in which a drug approved under an NDA can be rebated at less than 23%, and Mylan's statement would not reasonably have been understood that way. It was a matter of public record that there were circumstances in which a drug approved under an NDA could be classified as an N Drug and thus rebated at 13%. (A-136¶348.) The statute itself made that clear. *See* 42 U.S.C.A. § 1396r-8(c)(3) (2010).

What's more, the challenged statements could not have been materially misleading, because the rebate rates applicable to drugs approved under different application types were a matter of public record, as was the fact that EpiPen was

---

[4] Plaintiffs falsely suggest that earlier in the case the district court agreed with their now supposedly ignored claim. (Br.17-18.) Plaintiffs' only support for this assertion is a motion to dismiss ruling, which did not "agree" with Plaintiffs but rather merely assumed the truth of allegations as required.

14

approved under a "non-original" NDA and classified as an N Drug under the

MDRP.  (A-151-152¶¶407-11; CA-152-153; CA-3:11-5:8.)  The challenged

statements addressed a general framework created by a statute that is a matter of

public record and thus did not significantly alter the total mix of available

information.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988).

Even if Mylan's rebate statements had been materially misleading, Plaintiffs

made no showing that they were made with scienter, as the district court concluded

(SPA-165) in a ruling Plaintiffs conceded they are not appealing (Br.19 n.14).

Furthermore, Defendants offered sworn declarations attesting that the statements

were reasonably believed to be true and accurate based upon careful review.  (A-

104-111¶¶9-47; CA-36-75.)  Plaintiffs offered no contrary evidence.  Indeed, they

asked only two of the 30 deponents about these statements, and neither provided

any testimony supporting Plaintiffs' claims.  (A-167¶485; CA-88:3-22; CA-6:10-

7:5.)

### 2.    *Plaintiffs' government-investigation claim lacks merit.*

Plaintiffs next contend the district court erred in rejecting their claim that

Mylan misrepresented whether the government was investigating its classification

of EpiPen.  (Br.19.)  This argument is baseless.

Plaintiffs complain that Mylan's disclosures that it faced risks from ongoing

and prospective investigations were misleading because they "falsely impl[ied]"

15

that no such investigations had been initiated. (*Id.*) But as the district court properly found, "Defendants' disclosures on this point were not misleading". (SPA-179.) As an initial matter, the statements Plaintiffs challenge were not specific to EpiPen or any of Mylan's thousands of products. They were general statements of potential risk (in a general discussion of risk factors) that were plainly not intended to convey product-specific information. (A-69-71.) Mylan never told shareholders that regulators were not investigating Mylan's classification of EpiPen. (A-69-71.)

Moreover, the company *did* disclose that it faced risks from ongoing investigations:

> Any governmental agencies or authorities that *have commenced*, or may commence, an investigation of Mylan relating to the sales, marketing, pricing, quality, or manufacturing of pharmaceutical products could seek to impose, based on a claim of violation of anti-fraud and false claims laws or otherwise, civil and/or criminal sanctions, including fines, penalties, and possible exclusion from federal health care programs, including Medicare and Medicaid.

(A-125-126¶117 (emphasis added); A-68.) This statement expressly references investigations that "have commenced" in connection with explaining that such investigations, as well as investigations that "may commence", could subject Mylan to various fines and penalties. And in any event, the purpose of this disclosure is to warn shareholders of the general risk of financial or other sanctions that could be imposed by a governmental authority in connection with an

investigation, not whether an investigation was or was not pending. Based on the company's actual words, and the context in which they were used, no reasonable investor would have believed "have commenced" was purely hypothetical, or otherwise have been misled by them.

In addition, nothing about Mylan's government investigation statements is material to shareholders. Companies receive subpoenas all the time, and there is no general legal requirement to disclose them. *See Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 167 (D. Conn. 2019). Not only is it generally understood that the government monitors and investigates compliance with government programs, it was specifically and publicly understood that the government was monitoring and investigating MDRP drug classifications. (A-155-158¶¶424-36.) If a general risk disclosure could be transformed into securities fraud liability simply by touching on a broad category of risk, companies would be discouraged from identifying potential future risks, thereby providing investors with less information on which to make decisions. This is not the intent of the securities laws.[5]

---

[5] Plaintiffs misplace reliance on this Court's decisions in *Noto v. 22d Century Grp., Inc.*, 35 F.4th 95 (2d Cir. 2022), and *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014)—which both involved motions to dismiss. In *Noto*, the company had made statements specifically about an investigation's subject matter, and had expressly *denied* the existence of an investigation of which it was aware. *Noto*, 35 F.4th at 105. Similarly, in *Jinkosolar*, the company provided a detailed

Finally, Plaintiffs' claim fails because there is no evidence Defendants intended the company's risk disclosures to mislead anyone. Defendants tendered sworn and unrefuted testimony that they reasonably believed the challenged statements to be true, accurate and complete. (A-104-111¶¶9-47; CA-36-75.) Despite the magnitude of Mylan's document production and the number of witnesses deposed, nobody—no one from Mylan, no third party, no shareholder and no expert—offered evidence supporting Plaintiffs' scienter allegations. On the contrary, the undisputed evidence shows that Mylan acted reasonably in making the challenged statements. (A-127-128¶¶118-23; CSOF¶¶1183-88.)

### 3. *Plaintiffs' contrary-position claim founders.*

Lastly, Plaintiffs fault the district court for rejecting their contention that Mylan implied the government had not taken a contrary position concerning EpiPen's classification when Mylan allegedly knew the government already had. (Br.24.) The criticism is misplaced. Plaintiffs' argument amounts to a single paragraph with no factual or legal citations and should be rejected for that reason alone. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) (holding that

---

description of measures in place to comply with environmental regulations while it was aware that in fact it had committed "ongoing and serious pollution violations". *Jinkosolar*, 761 F.3d at 251.

"issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

In any case, Plaintiffs failed to show that the challenged statement was materially misleading. (SPA-177-178.) Plaintiffs' claim assumes the government (CMS) had taken the position that Mylan had misclassified EpiPen for purposes of the MDRP. It had not. On the contrary, the undisputed evidence showed that the CMS concluded it was "entirely fitting and proper" for Mylan to classify EpiPen as an N Drug (to use CMS's words). (A-147-148¶¶394-95; CA-163.) Veterans Affairs came to the same conclusion. (A-159-161¶¶442-49; CA-167.) When questions about the N-classification arose, Mylan expressly asked CMS whether it was asking the company to change the classification and CMS expressly stated it was not. (A-156-157¶432; A-80). In fact, CMS concluded that it lacked a sufficient basis to make that request under the current rules. (A-156¶430; A-80.) The district court thoroughly considered the extensive record as to why Mylan reasonably believed the EpiPen was properly classified as an N-Drug, including unrebutted deposition testimony (CA-148-160), and unequivocal statements from multiple government agencies (A-146-148¶¶390-96, 159-161¶¶442-49; CA-163, 167.)

Further precluding this claim, Plaintiffs failed to prove materiality. At best for Plaintiffs, a few government employees asked whether EpiPen should be

reclassified, and Mylan explained why the classification was correct.
(A-153¶418.)  Plaintiffs cannot demonstrate that such informal and ordinary course questions from certain government employees were material to stockholders, especially where, as here, CMS concluded that classifying EpiPen as an N Drug was "entirely fitting and proper" (A-147-148¶395; CA-163); it never withdrew the conclusion (A-153¶419); when Mylan asked CMS representatives whether they were asking Mylan to change the classification, they said no (A-156-157¶¶432-33; A-80); and CMS's internal communications reveal that CMS did not intend to seek any change in the classification of EpiPen until new formal guidance was issued (A-156¶430; A-80).  Nothing about the questions put to Mylan required disclosure.

Finally, Plaintiffs offer nothing to undermine the district court's scienter ruling.  Nor could they.  The challenged statements were true on their face; they were not specifically directed to EpiPen; and there's no evidence anyone intended them to obscure or hide information about EpiPen.  Defendants offered sworn and unrebutted testimony that Mylan and the D&O Defendants reasonably believed the challenged statements to be true, and Plaintiffs tendered no evidence to the contrary.  (A-104-111¶¶9-47; CA-36-75.)  Defendants' views were also supported by the unrebutted advice of counsel.  (CSOF¶¶450, 457; CA-146-147.)  Thus, Plaintiffs' contrary-position claim collapses for the multiple independent reasons adopted by the district court.

### C.     __Plaintiffs Cannot Demonstrate Loss Causation.__

Plaintiffs' MDRP Claims also fail for reasons the district court did not need to reach: Plaintiffs cannot prove loss causation.

To prove loss causation, Plaintiffs pointed to (1) third-party allegations on September 2, 2016 that Medicaid may have been "grossly overpaying" for EpiPen; (2) Senators calling on September 28, 2016 for DOJ to investigate whether Mylan had misclassified EpiPen; and (3) news surrounding the posting of a CMS letter regarding EpiPen's classification and Senators' reactions on October 6-7, 2016. (A-407-408.) None of these "disclosures" constitutes a corrective disclosure or a materialization of undisclosed risk; none revealed new facts that had not already been known to the market.

*First*, the facts underlying the misclassification claim were public both prior to and for the entire Class Period. (A-151-152¶¶407-12.) EpiPen's FDA application type was available on FDA's website, which was accessible through "a simple online search". (A-151¶407.) EpiPen's classification as an N Drug and the applicable NDA approval were available on CMS's website. (A-151¶¶408-09.) And the rebate rate applicable to N Drugs was clearly listed in the MDRP statute. (A-151¶410.) Plaintiffs offered no evidence that EpiPen's FDA application type, its classification as an N Drug or its rebate rate were not a matter of public record. (CSOF¶¶407-10.) And there is none.

21

*Second*, the September 2, September 28 and October 6-7, 2016 disclosures did not reveal any new information; they were merely negative re-characterizations of public facts. For example, Mylan warned that a governmental agency could take a position contrary to Mylan's position on how to "properly calculate and report [rebate] payments" for purposes of the MDRP. (A-125-126¶117.) Market participants already understood Mylan could be liable under federal law if it had purposefully and improperly classified EpiPen. (A-168-169¶489.) The alleged statements from the "CMS spokesman" quoted in the September 28, 2016 CNBC article and the October 5, 2016 CMS letter did not reveal information not already attributed to CMS. (A-168-170¶¶487-95.) The summaries of estimated Medicaid expenditures on EpiPen had been published since well before the Class Period. (A-171¶498.) And Plaintiffs failed to identify a single date when the allegedly concealed fact of the DOJ subpoena and subsequent investigation materialized or was revealed to the market and caused a statistically significant price decline. (A-299¶1109.)

*Third*, Plaintiffs failed to isolate the effect of the supposed fraud. As the district court pointed out, to establish the connection between disclosure and price drop at summary judgment, Plaintiffs were required to "disaggregate the declines or some rough percentage of the declines . . . resulting from other, non-fraud-related events". (SPA-197 (citation omitted).) Yet here, Plaintiffs failed to

22

disaggregate the harm allegedly flowing from the appealed portions of their MDRP

Claim from the harm allegedly flowing from (i) their EpiPen-Antitrust Claims

(which Plaintiffs have not appealed); (ii) the portions of the MDRP Claim that

Plaintiffs have not appealed (*i.e.*, whether Mylan properly classified EpiPen as an

N Drug, the heart of Plaintiffs' original claim); and (iii) negative reporting about

previously disclosed information.  Accordingly, by failing to disaggregate the

alleged harm, Plaintiffs failed to support an essential element of their case.

*Norton*, 145 F.3d at 117; *McCarthy*, 406 F.3d at 186.

## II.   THE DISTRICT COURT PROPERLY DISMISSED THE GENERIC DRUG CLAIMS.

Like their MDRP Claims, Plaintiffs' Generic Drug Claims fail for three

independent reasons.  Plaintiffs cannot prove (i) a materially false and misleading

statement or omission, (ii) scienter or (iii) loss causation.  Plaintiffs' appeal offers

no basis for disturbing the district court's well-reasoned opinion.

### A.   <u>Plaintiffs Cannot Show a Materially False or Misleading Statement.</u>

Plaintiffs focus their appeal on the district court's finding that they failed to

adduce evidence sufficient to prove a materially false or misleading statement.

They contend the district court held them to too high a standard and

misapprehended their "evidence" of market allocation and price fixing.  (Br.40.)

Plaintiffs are mistaken.

23

     **1.**     ***The district court properly focused on the claims pled by Plaintiffs.***

As an initial matter, Plaintiffs contend the district court erred in holding that "Plaintiffs could prevail only if they could prove that Mylan's collusive conduct was, in fact, unlawful; only if it was unlawful under one statute in particular, the federal Sherman Act; and only if that Sherman Act conspiracy extended to 21 specific drugs". (Br.25-26.) Plaintiffs are wrong.

*First*, the district court properly evaluated whether Plaintiffs had shown a violation of the law. To start, Plaintiffs based their Generic Drug Claims on the proposition that Mylan failed to disclose to shareholders that it had allegedly violated the law: they pled a case based on alleged violations of the law (TAC.10.); they prosecuted the case on that basis (P.MTDIII.23; P.MTDI.18-19); and Plaintiffs' responses to Defendants' contention interrogatories claim violations of the law. (CA-144, 145.) Moreover, Plaintiffs could not possibly have shown the challenged statements were materially misleading absent evidence sufficient to show a legal violation. Anticompetitive conduct falling short of a legal violation, if there is such a thing, would suggest neither the flawed business model alleged here nor a need for a change of business practice and would thus not be important to a reasonable investor. A company is free to pursue and generate income from lawful conduct.

*Second*, and for much the same reason, the district court properly focused its analysis on the Sherman Act. That's the statute referenced in Plaintiffs' pleadings, disclosures and arguments. (TAC.10; Br.47, 49, 66.) Nowhere in their TAC, contentions or summary judgment papers do Plaintiffs specifically identify any other law/statute that they contend Mylan violated concerning these claims. Nor, more importantly, do they offer any evidence establishing a violation of any such law/statute. *See George v. Reisdorf Bros., Inc.*, 410 F. App'x 382, 387 (2d Cir. 2011) (granting summary judgment where plaintiffs failed to provide evidence of, or even allege, violation of a regulation).

*Third*, Plaintiffs' claim that the district court improperly limited their proof to 21 drugs is meritless. (Br.27.) Plaintiffs do not (and could not) show that the district court erred in finding that they failed to state a claim as to any drug other than the 21 drugs identified by the district court, as explained in Defendants' motion to dismiss papers and the district court's rulings thereon. (MTDOp.II.14-15; MTDOp.III.9.) Neither Plaintiffs' summary judgment opposition brief nor their appeal brief identifies any drug other than the 21 to which Plaintiffs claim they were improperly limited. And Plaintiffs failed to adduce any evidence of price fixing or market allocation by Mylan as to any drug.

25

### 2. *Plaintiffs failed to adduce adequate evidence of wrongdoing.*

Plaintiffs survived Defendants' motions to dismiss in part on the promise that they had confidential informants—and would have other evidence of collusion—to substantiate their allegations of market allocation and price fixing. (MTDOp.I.33-34.) But the supposed confidential informants never materialized. Nor did any evidence of wrongdoing by Defendants.

### a. **Plaintiffs Cannot Demonstrate Market Allocation.**

Although Plaintiffs seek to create the impression that the district court applied the wrong legal standard in evaluating their claims (Br.28), they do not dispute that, to survive summary judgment, they were required to adduce direct or circumstantial evidence sufficient to show that Defendants entered into an agreement with one or more of Mylan's competitors to allocate markets (Br.29-30). Plaintiffs purport to offer evidence of unlawful market allocation as to six Mylan drugs. But nowhere in the materials cited by Plaintiffs is there evidence of an agreement between Mylan and any other company to allocate markets for the Alleged Market-Allocation Drugs.

For starters, Plaintiffs largely ignore the very drugs as to which they contend prices were fixed and markets allocated. They also disregard the import of the fact that the products at issue were sold in markets that were indisputably oligopolistic, which necessarily bears upon the inferences that can reasonably be drawn from

26

circumstantial evidence.  Instead, they distort the district court's opinion—such as by claiming (without supporting evidence or legal authority) that it applied a "theory of oligopolistic behavior" that "does not work for market allocation"[6]— and rest on generalized allegations that fall short of raising a reasonable inference of unlawful market allocation.

**Purported "Confessions"/Criminal Pleas/Investigations.**  Plaintiffs focus most of their attention on the Glazer Affidavit, which they portray as a smoking gun "confession" of a Mylan co-conspirator.  (Br.31-33, 41-43.)  But it's not.  The Glazer Affidavit relates to a single Mylan product, Doxy DR, and two customers at a single point in time (mid-2013).  It could not possibly support the market allocation scheme alleged by Plaintiffs.  (CA-295-298.)  Even with respect to this

---

[6] Plaintiffs cite passages of the Opinion out of context to suggest that the district court:  (1) "held that actions against self-interest are 'irrelevant in an oligopoly case'" (Br.47 (quoting SPA-189)); (2) "effectively 'immunize[d]' oligopolists' efforts to 'coordinate' through direct communications" (Br.28 (quoting SPA-184-185, 190)); and (3) "'suggest[ed] that the Supreme Court has held price-fixing all but immune from antitrust challenge in an oligopoly'" (Br.55 (citing SPA-194)).  But when read in full, there is no question that the district court did no such thing.  Rather, it simply and correctly (1) put evidence of alleged actions against self-interest in context (SPA-189-190); (2) acknowledged that direct communications between oligopolists can give rise to liability where "those communications rise to the level of agreement, tacit or otherwise" (SPA-190-191 (quoting *Baby Food*, 166 F.3d at 125)); and (3) stated that evidence other than list prices is needed to show 'tacit coordination or supercompetitive pricing' 'in an oligopoly setting'".  (SPA-194 (quoting *Brooke Grp.*, 509 U.S. at 236).)

single product and narrow time period, Glazer himself makes clear that there was
no agreement: he does not say he asked Mylan not to compete; he does not say he
offered Mylan any reason/incentive not to compete; and he expressly states
that Malik was "non-committal" about their conversation—meaning there was no
agreement. (CA-297¶14.) That is fatal to Plaintiffs' claim. Being non-committal
is the antithesis of a meeting of the minds. *See Apex Oil Co. v. DiMauro*, 822 F.2d
246, 252 (2d Cir. 1987) (holding antitrust plaintiffs must adduce evidence of "a
unity of purpose or a common design and understanding, or a meeting of the
minds").

Plaintiffs claim ███████████████████████████████
████████████████ However, none of the cited evidence provides any such
corroboration. Plaintiffs point to phone records and emails to show Glazer spoke
with Malik by phone on May 8 and July 13, 2013 (CA-295-298, 689-691), but they
do not offer evidence of the content of these two phone calls and ████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

(*See infra* at 38.)

Plaintiffs' other "evidence" concerning Doxy DR likewise shows the opposite of any agreement, namely: ████████████████████████ ███████████████████████████████ ████████████████ Frustration with aggressive competition is the opposite of collusion. ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████ but Plaintiffs cannot show that these results stemmed from allocation as opposed to lawful competition.  (CSOF¶¶1715-37.)

Regarding the other five allegedly market-allocated drugs, Plaintiffs chiefly point to internal emails from manufacturers other than Mylan.  (Br.35-38.) However, none of these emails shows or even implies an agreement between Mylan and manufacturers to allocate markets.  To the contrary, the emails reflect lawful competition (and competitors' irritation with Mylan) as each company's

sales and pricing teams jockeyed to make business decisions that would lead to the

best outcome for their company. The emails refer to ████████ ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Plaintiffs assert that "[t]here were also other criminal charges and pleas".

(Br.33, 42.) However, that the government has investigated the industry and that

certain of Mylan's competitors (or their employees) have been charged, pled guilty

or entered deferred prosecution agreements does not permit an inference that any

defendant here joined an unlawful conspiracy. *See In re Elevator Antitrust Litig.*,

502 F.3d 47, 51-52 (2d Cir. 2007) (per curiam) (holding that "absent evidence of

linkage," anticompetitive conspiracy cannot be imputed by "if it happened there, it

could have happened here" reasoning). No defendant has been charged with any

crime, and Defendants offered sworn testimony denying wrongdoing.[7]

(Answer¶654.)

---

[7] In attempting to lump Mylan together with certain of its competitors,
Plaintiffs inappropriately cite the "slight evidence" standard mentioned in *United
States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985). (Br.33.) That

Finally, Plaintiffs state "Mylan is the subject of antitrust investigation and civil suits by state law enforcers". (Br.33.) But that falls far short of establishing that Mylan allocated markets. In fact, the investigation suggests just the opposite. DOJ investigated the possibility of market allocation in the industry and charged a number of companies (A-495-510), but neither Mylan nor any of its employees has ever been charged.

**Fifth Amendment Pleas.** Plaintiffs contend the district court erred in not drawing an inference that Mylan was involved in a market allocation scheme from the fact that two employees asserted their Fifth Amendment right against self-incrimination. (Br.34-35, 43-44.) However, an adverse inference cannot be taken from a Fifth Amendment invocation except in limited circumstances not applicable here. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *see also Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991).

The district court properly concluded that an adverse inference was unwarranted. (SPA-174-175.) In determining whether to draw such an inference, courts consider multiple factors, including: (1) the nature of the relevant relationships; (2) the degree of control; (3) the compatibility of interests; and

---

formulation has been abrogated. *United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008).

(4) the role of the witness in the litigation. *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997). The relationship between Mylan and Aigner/Nesta could not reasonably sustain an adverse inference against Mylan. Mylan did not instruct Aigner or Nesta to invoke the privilege. Both Aigner and Nesta are represented by separate counsel, and Mylan had no ability to force Aigner or Nesta to forgo their constitutional rights. Moreover, Aigner and Nesta had no role in making the challenged statements (A-111¶47), and they could not unilaterally direct the pricing/bidding decisions subject to Plaintiffs' allegations, as these decisions involved rigorous processes requiring the approval of multiple people. (A-209-219¶¶660-701.) Aigner's and Nesta's independent decisions to exercise their constitutional right not to testify cannot sustain an adverse inference against Mylan.

In addition, the requested inference lacks the necessary corroborating evidence. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). ███████████████████████████████████████████████ ████████████████████████████████████████████ But that "evidence" fails to permit an inference of conspiracy for the reasons discussed at length by the district court. (SPA-181-194.) Moreover, as discussed, the guilty pleas and deferred prosecution agreements for other manufacturers concern only two of the At-Issue Drugs (Doxy DR and Benazepril) and do not permit an inference that

Mylan engaged in any conspiracy—for instance, the Deferred Prosecution

Agreement and related Information concerning Sandoz references Rising,

Company B (a corporation with its principal place of business in Michigan) and

Company C (a corporation with its principal place of business within the Eastern

District of Pennsylvania). (A-82-95; A-544-563.) Mylan, which was then

headquartered in Canonsburg in the Western District of Pennsylvania, was not an

alleged co-conspirator. Nor do the phone records or emails cited by Plaintiffs

implicate Mylan in any conspiracy. (Br.9-12.)

Plaintiffs criticize the district court for stating that Plaintiffs failed to

articulate what specific deposition questions prompted the witnesses' invocation of

the Fifth Amendment privilege or in what manner they would be probative of the

existence of agreements. (Br.43.) But Plaintiffs' summary judgment brief

included only a single sentence to support this point and did not identify any

specific question or explain its significance. *Cf. Glanzer*, 232 F.3d at 1265

(holding that "each instance where [an] adverse inference was drawn, or not

drawn" is to be assessed "on a case-by-case basis"). Plaintiffs pointed the district

court to their 1,254-page statement pursuant to Rule 56.1, but even the questions

referenced there were highly generalized, and Plaintiffs did not explain why they

were probative. (CSOF¶¶2107-2109.)

Plaintiffs' suggestion that the inference to draw from a Fifth Amendment invocation is a jury question and cannot be decided at summary judgment (Br.44) is mistaken. Plaintiffs bore the burden to show that an adverse inference was warranted, and they failed to do so. Moreover, the mere potential for an adverse inference alone is insufficient to withstand summary judgment. *See, e.g.*, *Avirgan*, 932 F.2d at 1580 (affirming summary judgment grant despite Fifth Amendment invocation); *Valenti v. Penn. Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 453-54 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013).

**Interfirm Communications.** Plaintiffs contend the district court was required to draw an inference of an agreement from "evidence of a high level of interfirm communications". (Br.35-38.) But the cited communications do not evidence an agreement, let alone an agreement between Mylan and any competitor. To the contrary, the alleged communications reflect that Mylan continued to compete aggressively—often to its competitors' frustration. (SPA-193.) ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs say this proves an agreement to allocate markets. (*Id.*) On the contrary, it is a fallacious inference of causality from temporal sequence. *See, e.g.*, *Wilson v. Reuben H. Donnelley Corp.*, No. 98 CIV.

34

1750 (AGS), 1998 WL 770555, at *4 (S.D.N.Y. Nov. 2, 1998) ("'Post hoc, ergo propter hoc' is a logical fallacy that has never been the law of this Circuit.").

Plaintiffs point to alleged statements concerning "play fair" to suggest Mylan agreed to allocate markets. (Br.37.) Nothing about the expression denotes an unlawful agreement; if anything, "play fair" suggests lawful conduct. What's more, the evidence indicates that Mylan continued to compete, debunking Plaintiffs' unsupported argument that "play fair" actually means "play in a criminally unlawful manner". For example, following Glazer's purportedly-agreed understanding that Mylan would not defend CVS with competitive bids, Mylan approved a price reduction to CVS (although CVS already had Mylan's lowest price). (A-277-278¶996; CA-217.) Mylan then considered submitting an additional competitive bid. (A-277-278¶996; CA-221.) These are not the actions of a company that has agreed to cede a customer to its competitor.

Plaintiffs assert the district court erred in dismissing the cited communications as "not probative in an oligopoly setting", as "idle 'shop talk'" among "low-level 'field sales representative[s]'" and as the mere "monitoring" of publicly available information. (Br.45-46.) Plaintiffs assert the district court should not have dismissed these communications because they were not offered to establish "Section 1 liability", but rather as a "plus factor" sufficient with other evidence to permit an inference of conspiracy. (Br.45.) But the court did not

35

ignore any of Plaintiffs' "plus factor" evidence; it carefully considered the evidence for each of the Alleged Market-Allocation Drugs and found it insufficient to permit an inference of a conspiracy. (SPA-188-193.) For example, the court expressly addressed the cited communications about Valsartan/HCTZ and explained that they involved persons without pricing or market allocation authority, which is fatal to Plaintiffs' claims whether the market was an oligopoly or not. (Op.66 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999)).)

Finally, Plaintiffs misread the district court's decision to suggest that it held interfirm communications "immune" from liability. (Br.46-47.) Not so. The district court held simply that interfirm communications are not actionable when the evidence fails to establish an "agreement, tacit or otherwise"—as here. (SPA-190.) Plaintiffs offered no direct evidence of agreement, and the alleged interfirm communications, even when combined with Plaintiffs' "plus factors", did not rise to the level necessary to infer conspiracy. (SPA-186-187.) Plaintiffs' claim that the district court erred in considering the oligopolistic nature of the market in evaluating their market-allocation claims is contrary to well-established law. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007) (considering market dynamics in evaluating market-allocation claims); *In re Int. Rate Swaps Antitrust*

36

*Litig.*, 261 F.Supp. 3d 430, 462 (S.D.N.Y. 2017) (same); *In re Zinc Antitrust Litig.*, 155 F.Supp. 3d 337, 375 (S.D.N.Y. 2016) (same).

**Conceding Customers Against Self Interest.**  Plaintiffs point to what they call "[t]he companies' repeated conceding of customers to each other—sometimes by simply refusing to bid for business, sometimes by placing high bids they knew would be rejected."  (Br.38.)  However, they provide no evidence to support the assertion:  no evidence Mylan conceded customers to competitors; no evidence competitors conceded customers to Mylan; no evidence Mylan refused to bid on business it believed to be in its best interest; and no evidence Mylan placed bids it knew would be rejected.

Here again, Plaintiffs mistakenly claim the district court misunderstood the role of self-interest in an oligopoly.  (Br.47-49.)  The district court's opinion correctly explains why in oligopolistic markets, what may appear to be an act against interest can actually be self-interested because of the interdependent nature of these markets.  (SPA-189-190.)  The district court's opinion is consistent with case law on this point.  *See Valspar Corp. v. E.I. Du Pont de Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-62 (3d Cir. 2004).[8]

---

[8] Plaintiffs seek to backpedal from their own experts' testimony.  (Br.49.)  But that testimony is clear.  Plaintiffs' experts acknowledged that conceding market

**Alleged Motive To Conspire/Conditions Conducive To Collusion.**

Plaintiffs claim "the participants had strong economic incentives to conspire and were operating in a market conducive to such collusion, containing a relatively small number of players who could feasibly coordinate their sales practices". (Br.39.)  Plaintiffs fail to identify the market they are referring to or explain why the mere fact a market is small makes it vulnerable to market collusion.

Nor do they grapple with the fact that Mylan had more significant inducements not to allocate markets—such as avoiding criminal and civil liability, damage to its reputation and substantial fines and penalties.

As this Court has recognized, "evidence that the defendant had a motive to enter into a[n antitrust] conspiracy . . . may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism".  *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (citation omitted); *see also White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (in an oligopoly, "motivation is . . . synonymous with

---

share to competitors, and declining sales opportunities, can be consistent with a firm's self-interest and independent decision-making.  (A-200¶¶610-620.)

interdependence and therefore adds nothing") (quoting 6 Areeda & Hovenkamp, *Antitrust Law* ¶1434(c)(1) at 269 (3d ed. 2007)).

**Resulting Stable Market Share.** Plaintiffs purport to have shown "actual market division that arose and remained stable overtime". (Br.39.) However, the cited expert testimony showed no such thing. Market share is not a matter of expert opinion; it is a matter of fact. And the undisputed fact here is that market shares fluctuated consistent with ordinary-course competition. (A-197-198¶¶602-08.) ████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Even if shares had been stable, stable market shares in oligopolistic markets are consistent with independent action. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015).

**Overall Assessment of the Evidence.** Unable to establish error in the district court's handling of Plaintiffs' individual categories of evidence, Plaintiffs fault the district court for purportedly "atomiz[ing]" the evidence, placing it in "silo[s]" and "declar[ing] each piece insufficient without the others". (Br.39-40,49-51.) That, however, is not a fair reading of the Decision. The district court gave the parties a full and fair opportunity to present their arguments/evidence, and

there is no reason to believe the court did not consider everything presented in totality. *See Newport News Holding Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 n.7 (4th Cir. 2011) (holding courts are not required to identify every piece of evidence they consider in making a decision); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (same).

Plaintiffs claim that the district court should not only have looked beyond the shortcoming in Plaintiffs' "evidence" as to the At-Issue Drugs, but also that it should have considered evidence of collusion regarding drugs not properly pled. (Br.51.) This makes no sense. Plaintiffs effectively contend that the court looked too closely—that if the court had just blinded itself to the flaws in their proof, they might have a case. Such a contention is not a basis for avoiding summary judgment. *See, e.g.*, *Valassis Comm'cns, Inc. v. News Corp.*, No. 17-cv-7378 (PKC), 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (granting partial summary judgment and observing that "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth' from which antitrust injury can arise"); *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) ("[Plaintiff] does not, and cannot, cite any authority for the proposition that a series of unilateral acts that do not violate the antitrust laws may be aggregated into an unlawful 'course of conduct.' . . . Put differently, courts need not resolve the

40

sorites paradox and determine precisely how many grains of sand constitute a heap.") Even if the court had looked beyond the At-Issue Drugs here, Plaintiffs did not marshal evidence sufficient to survive summary judgment.

Throughout their brief, Plaintiffs suggest incorrectly that the district court subjected them to a heightened burden. (Br.40-41.) The district court was clear that, to survive summary judgment generally, Plaintiffs must raise a genuine issue of material fact. (SPA-131.) As to Plaintiffs' Section 1 claim, they had to "adduce evidence that 'tends to exclude' the possibility of independent, non-culpable action." (SPA-182-183.) This burden is no higher than that imposed by this Court, as well as the Supreme Court.[9] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015). Plaintiffs briefed their case on an immense factual record that the district court thoroughly reviewed and found wanting.

### b. Plaintiffs Cannot Demonstrate Price Fixing.

Plaintiffs' allegations of price fixing fare no better, for the reasons stated above and more. It is undisputed that Mylan's pricing decisions were made subject

---

[9] Plaintiffs misplace reliance on this Court's decision in *In re Publication Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2016), which involved an alleged conspiracy supported by evidence very different from what is presented here. Here, as the district court held, there was neither direct evidence nor circumstantial evidence sufficient to infer an unlawful agreement.

to a rigorous process bound by established guidelines and requiring approval from numerous individuals from different business functions. (A-209-220¶¶660-708; CA-91, 94-95, 168-174.) Mylan's pricing was set by committee (A-210-212¶¶668-77), and no one person had unilateral decision-making authority (CA-168-174.) Defendants tendered undisputed evidence, on a drug-by-drug basis, that the accused price increases were determined independently, *i.e.*, not pursuant to an agreement with any competitor.[10] Plaintiffs fail altogether to address this evidence of Mylan's pricing decisions, and the "evidence" cited by Plaintiffs falls far short of showing an unlawful agreement.

Ignoring the sworn testimony of the people involved in setting prices at Mylan, Plaintiffs invoke (in cursory fashion) the same "plus-factors" cited to support their market-allocation claims. (Br.51-52.) That "evidence" is no more probative of an agreement to fix prices than it is of an agreement to allocate markets (for the reasons discussed above). Here again, Plaintiffs' purported "best" evidence—the Glazer Affidavit—actually undermines their claim: it makes no

---

[10] Albuterol (A-227¶744); Amiloride (A-232¶¶766-67); Benazepril (A-235-236¶¶783-85); Clomipramine (A-238¶¶797-98); Divalproex (A-241¶¶813-14); Doxasozin (A-244¶824); Ketorolac (A-246¶¶836-37); Levothyroxine (A-248-249¶¶847-49); Loperamide (A-251¶¶861-63); Methotrexate (A-254¶878); Nadolol (A-256-257¶892); Propranolol (A-260¶908); Tizanidine (A-262¶922); Trifluoperazine (A-264¶¶932-33).

mention whatsoever of any participation by Mylan or any Individual Defendant in any purported price fixing, and, as discussed, is actually evidence that there was no agreement between Mylan and its competitor.[11]

Plaintiffs contend they also "presented evidence specific to the price-fixing claims". (Br.52.) There is, however, no question that Plaintiffs did not follow the court's instruction to prove their case on a drug-by-drug basis. (MTDOp.III.8.) Plaintiffs' summary judgment opposition brief made little mention of the supposedly price-fixed drugs, and they made almost no mention of them on appeal. As the district court stated, "Plaintiffs chose to refer to the drugs as 'the Price-Fixing Drugs' without at any point naming them or attempting to make any arguments based on direct evidence or circumstantial evidence, such as an agreement- or drug-specific plus factors". (SPA-194.)

Unable to proffer any direct evidence of price fixing, Plaintiffs rest their case on allegations of parallel list prices. (Br.11.) However, the evidence shows that the challenged pricing was no more parallel than one would expect in any

---

[11] Plaintiffs misleadingly suggest the district court "did not dispute that the record shows that Mylan increased prices in parallel with its co-conspirators". (Br.51.) Not so. The district court did not find that Plaintiffs proved parallel pricing (as Plaintiffs suggest), and the court expressly rejected Plaintiffs' claim of an unlawful price-fixing agreement as unsupported and out of touch with "economic rationality". (SPA-193-194.)

oligopolistic market, and lawful interdependence readily explains the observed price changes. *Valspar*, 873 F.3d at 195. The increases in list prices claimed by Plaintiffs were neither simultaneous nor so close in time that they cannot be explained as responsive to changes reflected in the market. (A-195-197¶¶596-601.) ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

Moreover, Plaintiffs (i) focus on list prices that hardly any customer paid;[12] (ii) omit reference to the actual data showing very different and individualized transaction prices; and (iii) ignore that price increases were not "parallel", but rather, sequential, as one would expect in an oligopolistic marketplace. While some of the challenged increases may have been "high" on a percentage basis

---

[12] WAC is a public list price that ███████████████████████ ████████████████████████████████████ The actual price customers pay is referred to as the contract or transaction price. (A-190-191¶580.) The Supreme Court has held it "unreasonable" to derive conclusions about the existence of a conspiracy from list price data. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 236 (1993). Plaintiffs claim that their expert considered pharmacy invoice prices (Br.56.), but do not point to any actual analyses conducted to quantify the effect of the WAC price increases on the net prices for Mylan's or other manufacturers' customers where "price competition is most likely to take place".

(which is no doubt why Plaintiffs chose them out of thousands of drugs and tens-of-thousands of price events), they were not necessarily large in absolute terms and are explained by contemporaneous documentation and/or Mylan's pricing strategy. For example, Mylan made five price increases for Amiloride 5/50mg tablets between 2011 and 2014, but the absolute change in the product's list price over that time period was less than $0.40. (A-195¶598.) Transaction prices were lower and varied from customer to customer. (*See* A-190-191¶580.)[13]

███████████████████████████████████████████

████████████████████████ citing (i) a few communications concerning each of the Alleged Price-Fixing Drugs cited by their expert, (ii) supposed phone records, (iii) the fact of industry conferences, and (iv) two documents concerning Benazepril. But, as described below, none of these materials evidences an agreement:

- *Expert Report Documents*: None of the cited documents evidences an agreement to collude regarding any of the At-Issue Drugs.

---

[13] Plaintiffs' claim that Mylan acted contrary to its self-interest assumes that Defendants increased prices above marginal cost. But in an oligopolistic marketplace, it can be in a company's self-interest not to lower prices to chase market share or engage in bidding wars. Doing so could ultimately lower profits despite an increase in market share. (A-198¶610); *see Flat Glass*, 385 F.3d at 362 (finding price increases above costs could result from interdependence in oligopoly).

Most of the documents are internal to either Mylan or a competitor and reflect the unremarkable fact that Mylan and its competitors monitored one another's list pricing (which is publicly available) through publicly available means.[14] ███████████████████████████████

██████████████████████████████████████████████

███████████

- *Alleged Phone Records*:  Plaintiffs rely on a table of supposed calls between Mylan ████████████████ but the cited declaration makes clear the table has no evidentiary value. ██████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

---

[14] Amiloride (A-232-233¶¶768-69); Benazepril (A-236¶¶786-88); Clomipramine (A-238-239¶¶799-800); Doxasozin (A-244¶¶826-27); Ketorolac (A-246¶¶838-39); Levothyroxine (A-249¶¶850-52); Loperamide (A-252¶¶865-66); Methotrexate (A-254-255¶¶879-80); Nadolol (A-257¶¶893-94); Propranolol (A-260¶¶910-12); Tizanidine (A-263¶¶923-24); Trifluoperazine (A-264-265¶¶934-35).

██████████████████████████████

██ ████████████████████████

- *Industry Conferences*:  In a footnote, Plaintiffs highlight price increases for certain drugs in the months following an industry conference.  (Br.53 n.32.)  But such conferences happen many times a year (so that there is always a temporal link between conferences and price increases); Plaintiffs did not adduce any evidence that relevant representatives of competing manufacturers of these drugs attended the conferences; and in no case did Plaintiffs adduce any evidence that Mylan communicated with its competitors at these conferences regarding the Alleged Price-Fixing Drugs, let alone came to an unlawful agreement on them.  (CA-16-29§11.1; CA-15¶233(b) n.259.)

- *Benazepril Emails*:  Plaintiffs also suggest that a pair of emails regarding Benazepril evidences price fixing.  (Br.52 n.31.)  These emails show nothing of the kind.  They mostly relate to drugs as to which Plaintiffs do not bring a claim.  With respect to Benazepril, ████████ ████████████████████████████████ ████████████████████  This is the opposite of what one would expect if Mylan ██████████ actually had an agreement to fix prices (which they did not).

47

Plaintiffs portray the challenged price increases as "unexplained". (Br.54.) In fact, Mylan did explain its price increases. (CA-91, 94-95, 168-174.) Mylan's pricing of generic drugs during the relevant period was based upon numerous market and customer-specific factors, including supply constraints, competitor exit and entry, demand changes, inflation, exchange rates, borrowing costs, regulatory practices, legislation, conduct by PBMs, conduct by other purchasers, change in market conditions and many more. (A-216-219¶¶698-701; CA-168-174; CA-94:15-95:18.) As the district court stated, "[t]he failure of Plaintiffs to deal with Mylan's explanation of what economic rationality entails in the generic drug market makes it impossible to conclude that 'no reasonable firm would have engaged' in Defendants' course of conduct absent being party to a conspiracy".[15] (SPA-194.)

Lastly, Plaintiffs contend the district court dismissed their price-fixing "evidence" on the ground that price-fixing is "all but immune from antitrust challenge in an oligopoly". (Br.55.) That misrepresents the Decision. The district

---

[15] While Plaintiffs claim that the price increases for many drugs "stopped when the government investigations started" (Br.54), the record does not bear that out. Some of the challenged increases occurred after Mylan received its first subpoena from Connecticut. (Resp.CSOF¶¶1966,2091; TAC¶¶284-293, 306-311, 312-317.) Prices decreased before and after the subpoenas, following a pattern typical of oligopolistic markets and inconsistent with the Plaintiffs' claims. (A-194¶¶591-592, A-232¶764; Resp.CSOF¶¶1966, 2091.)

court made clear that it was dismissing Plaintiffs' price-fixing claim because Plaintiffs were relying on the same plus factors and underlying evidence as with their market allocation claim, which the district court had properly rejected as legally insufficient. (SPA-194.) Plaintiffs also contend "[t]o the extent the District Court suggested that Plaintiffs' claims were impermissibly based on an analysis of list prices, rather than actual prices charged," it was mistaken. (Br.55.) Although the Opinion did not turn on this distinction, there is no question that Plaintiffs' claims were based on list prices.[16] Moreover, the Supreme Court has held that "it would be unreasonable to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflect only list prices". *Brooke Grp. Ltd*., 509 U.S. at 236.

### 3. *Plaintiffs Cannot Demonstrate Materiality.*

Even if a reasonable jury could find collusion, such a finding would not demonstrate the actual statements at issue were materially false or misleading. The challenged statements concerned the broader pharmaceutical industry, and Plaintiffs cannot demonstrate that the alleged conspiracies, even if proven, would

---

[16] Every figure in the Complaint supporting Plaintiffs' price-fixing claims is based on WAC, a list price. (TAC¶261 n.40; figs.A-N.) ████████████████

49

have had a material effect on the industry.  Plaintiffs similarly cannot carry their

burden concerning the challenged statements explaining income because they

cannot show that the alleged collusion had a material effect on Mylan's actual

income.

### a. Mylan's Statements Explaining the Market Were Not Materially False or Misleading.

Plaintiffs challenge several statements that described generally the

competitiveness of the U.S. pharmaceutical industry and the competitive forces

Mylan faced.  (TAC§VII.)  For example, Mylan stated that "[t]he U.S.

pharmaceutical industry is very competitive".  (A-121-122¶107.)  Even if Plaintiffs

could prove collusion, they failed to point to evidence sufficient to demonstrate

that these general statements regarding the entire U.S. pharmaceutical industry

were materially false or misleading.  Plaintiffs made no contentions of any

anticompetitive behavior by entities other than generic manufacturers (a small

fraction of the industry) and ignored the fact, ██████████████████████████

████████████████████████████████████████████████████████

██████████████████  In fact, it is undisputed that:  (i) the average price of

generics fell each year during the period from 2007 to 2016, (ii) the share of all

prescriptions for generic drugs increased from 84% to 90% during the period from

2012 to 2019, and (iii) the estimated earnings of average industry participants in

the generic pharmaceutical industry fell over that same period. (A-176¶520.)

Plaintiffs adduced no evidence tending to show Mylan's statements describing the

industry as "very competitive" and "highly sensitive to price" were inconsistent

with economic evidence or reality, let alone materially misleading. (A-368.)

Plaintiffs also failed to demonstrate that the markets of any of the At-Issue

Drugs are indicative of or impact the U.S. pharmaceutical industry as a whole, or

even the generics segment of the industry. More than 6,000 generic drug products,

containing over 2,200 different active ingredients, were manufactured in the U.S.

in 2013-2014. (A-175¶514.) In each year from 2012 to 2016, the At-Issue Drugs

collectively accounted for only 1.38% to 3.87% of total generic drug sales in the

U.S. and an even smaller portion of the total pharmaceutical sales in the U.S.

during those years. (A-176¶521.) These percentages concern the total sales for the

At-Issue Drugs, not the difference between sales in the markets and a "but-for"

competitive market, a figure Plaintiffs have never put forth. (A-177¶523.) Even if

the individual markets for any or all of the At-Issue Drugs were not competitive,

there is no evidence sufficient to establish a lack of competition in the U.S. generic

pharmaceutical industry, much less the entire pharmaceutical industry. Mylan's

statements explaining the market thus cannot be characterized as materially false or

misleading.

### b.     Mylan's Statements Explaining Income Were Not Materially Misleading.

Plaintiffs challenge various statements explaining income from certain of Mylan's Forms 8-K that summarized the "sources and causes of Mylan's financial success". (MTDOp.I.11.)  For example, on an August 9, 2016 earnings call, Mylan stated:  "Overall, our generics business delivered third-party net sales of approximately $2.1 billion for the quarter, an increase of 4% compared to prior-year quarter." (TAC¶509.)  However, Plaintiffs failed to adduce admissible evidence that the alleged misconduct was a source of Mylan's income sufficient to render Mylan's statements explaining income materially misleading.

Plaintiffs made no effort to measure the impact of any alleged price fixing on Mylan's income and thus did not support their contention that Mylan's income was impacted at all, much less materially.  (A-177¶523.)  Plaintiffs' price-fixing-conspiracy theory is that Mylan and its competitors entered into agreements to fix *list* prices.  (TAC¶¶261 n.40, 371.)  But list prices do not represent income received by manufacturers and do not correlate with income or profits. (A-191¶582.)  Plaintiffs offered no evidence to evaluate whether list price conspiracies, akin to the ones alleged by Plaintiffs for 14 drugs out of thousands, had sufficient impact on Mylan's income to affect the accuracy of Mylan's statements explaining income. (RCSOF¶¶1973-74.)  Neither Plaintiffs nor their

experts offered any analysis of Mylan's income or profitability using contract prices or net prices. (*Id.*) "[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion". *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985).[17]

Similarly, Plaintiffs failed to tender evidence to support a finding that Mylan misstated a material source of its income from the Alleged Market-Allocation Drugs. Concerning Capecitabine, Clonidine, Fenofibrate and Tolterodine, Plaintiffs made no effort to measure the impact of Mylan's alleged misconduct on Mylan's income and thus have identified no evidence of any impact, much less a material one. (MSJ.Br.67-69.) ██████████████████

███████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

---

[17] In opposition to Defendants' summary judgment motion, Plaintiffs cobbled together a new calculation (nowhere previously disclosed) attempting to remedy this failure. But the calculation is merely addition (riddled with errors) of revenues associated with each of the 14 Alleged Price Fixing Drugs, without any analysis of the difference between sales for these products and estimated sales in "but-for" competitive markets. (A-177¶523.)

████████████████████████████████████████

████████████  *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v.*

*Royal Bank of Scotland Grp., PLC*, 783 F.3d 384, 391 (2d Cir. 2015) (holding

undisclosed exposure of amount representing less than 1% of defendant's total

assets to be "presumptively immaterial").

### B.    Plaintiffs Failed To Adduce Evidence Sufficient To Show Scienter.

Even if there were a fact question as to whether one of the challenged

statements was materially false or misleading (and there is not), Plaintiffs' Generic

Drug Claims lack merit because Plaintiffs failed to prove scienter.  The district

court did not reach this issue (because it did not need to), but Plaintiffs fell far

short of showing that Defendants acted with fraudulent intent.

The "crux" of the scienter allegations that the Court found sufficient at the

pleading stage were the allegations of two confidential witnesses, "CW1",

(TAC¶¶148-149,585-586; MTDOp.I.33), and later, "CW2", (TAC¶590).

However, Plaintiffs abandoned all allegations attributed to any confidential

witness, declining to offer or rely on CW1's or CW2's testimony.  (A-404.)

Lacking the promised confidential witnesses, Plaintiffs argued that a jury

could infer corporate scienter "because all the price increases at issue were

approved by Mylan's Executive Committee and MPI's Pricing Committee", "the

purpose of Mylan's pricing committees was to make reasoned decisions", and

therefore members of the committees must have known "that the price increases were the result of price-fixing agreements". (A-402.) That makes no sense. At Mylan, pricing decisions were not made by any one person but rather by committee, and they were documented. (A-402; RCSOF¶¶2128-29, 2134-37.) However, the mere existence of a pricing committee designed to make reasoned decisions does not imbue it with knowledge of allegedly illegal conduct. Indeed, the very purpose of the pricing committees was to ensure a rigorous and independent pricing process with checks and balances to avoid even the appearance of improper conduct. (A-210-215¶¶668-95.)

There is not a shred of evidence in pricing committee documentation or anywhere else that any Mylan committee was aware of any attempts at price fixing or took price fixing into account in making its decisions. On the contrary, the available evidence indicates all Mylan pricing decisions were made independently based on factors such as manufacturing and supply constraints, relationships with customers and contractual provisions. (A-216-220¶¶696-706.)

In the end, Plaintiffs conceded (as they had to) that their scienter case turned on "knowledge of pricing activity". (A-403.) But knowledge of pricing activity in general is not the same as knowledge of illegal price fixing. That a person might have some knowledge of pricing (at some level of generality) does not mean s/he knows everything about pricing in an organization of thousands working to sell

a myriad of different drugs worldwide.  That is especially so where, as here, Mylan had a rigorous pricing process, using committees and a series of checks and balances, to prevent any pricing decision from being made by a single person or for the wrong reason.  (A-209¶¶660-662.)  Plaintiffs' theory converts mere knowledge of a business into culpable intent and is inconsistent with the statute, the case law and common sense.

Here again, Plaintiffs had (and have) no answer for the undisputed evidence that Mylan acted in good faith in making the challenged statements.  (A-104-111¶¶9-47; CA-36-75; *infra* § III.)  They failed altogether to create a fact question as to scienter regarding the statements at issue.  This alone is dispositive.

### C.   <u>Plaintiffs Cannot Demonstrate Loss Causation.</u>

Finally, dismissal of the Generic Drug Claims should be affirmed because Plaintiffs failed to adduce evidence sufficient to permit a finding of loss causation as to any of the triggers they identified.  (SPA-195-203.)  The district court found Plaintiffs' causation arguments wanting for two overarching reasons:  (1) they failed to "isolate the effect" of the alleged corrective disclosures (*i.e.*, failed to disaggregate price declines attributable to alleged fraud from declines attributable to non-fraud events) (SPA-197-198); and (2) they failed to show, for multiple reasons, a correlation between any of the alleged triggers and the alleged fraud (SPA-198-203).  Plaintiffs offer no basis to disturb the district court's decision.

Plaintiffs essentially ignore the district court's disaggregation holding (reflected in (1) above).  (Br.56-62.)  Although it was the district court's lead rationale and relates to each of the disclosures at issue (SPA-197-198), Plaintiffs mention disaggregation only concerning the May 2019 disclosure and only to argue that "disaggregation between drugs" is "inappropriate because the losses largely represented general reputational harm".  (Br.61.)  Plaintiffs cite no case relieving them of the obligation to disaggregate declines from alleged fraud events and non-fraud events, and there is none.  Nor do they point to any showing of disaggregated declines.  On the contrary, Plaintiffs concede they "were unable to sufficiently disaggregate the effect of [disclosures concerning an investigation of Mylan] from other confounding factors".[18]  (Br.58 n.36.)

Likewise, Plaintiffs have no response to the other grounds on which the district court found a failure of proof of loss causation.  Rather than deal with the district court's rulings head on, Plaintiffs now claim for the first time that Defendants sought to conceal that Mylan's "seemingly lucrative business model (upon which its valuation was based) was unsustainable, resting in material part on

---

[18] Plaintiffs seek to mitigate the impact of this concession by claiming "not to rely on [the news] to prove loss causation here".  (Br.58 n.36.)  But their supposed non-reliance is immaterial.  What matters for present purposes is that Plaintiffs admittedly failed to disaggregate, which precludes a finding of loss causation.

a conspiracy that could be broken up by law enforcement or fall apart on its own at any time". (Br.57.) That's not the theory Plaintiffs presented below; it does not correlate to the disclosures Plaintiffs identified; and it is incompatible with the undisputed evidence, *e.g.*, Plaintiffs have not shown the DOJ investigation has resulted in any action involving Mylan or any of its employees or any damage to Mylan's business.

Moreover, nothing in Plaintiffs' appeal brief undermines the district court's disclosure-specific rulings, which Plaintiffs ignore and/or distort:

January 11, 2017. Plaintiffs argue that the district court erred in rejecting their claim that remarks by President-elect Trump reflected the materialization of a concealed risk of "government scrutiny". (Br.59.) But they mistakenly contend that "[t]he only reason the District Court gave for rejecting [their] proof was that President Trump did not single out *generic* drugs or reference Mylan or any of its drugs by name". (*Id.*) The district court also rejected Plaintiffs' contention because regulatory scrutiny was already known to the market, such that Trump's "statements are parallel to similar posturing by politicians that has been rejected in this district as a sufficient means by which to survive summary judgment". (SPA-198-199.) Having ignored the point, Plaintiffs waived any challenge to this ruling. *Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010).

58

Even if the district court had focused solely on the fact that Mr. Trump did not single out *generic* drugs or reference Mylan or any of its drugs by name, the district court got it exactly right. Mr. Trump had long criticized pharmaceutical pricing, and his remarks simply repeated the criticisms he made at a rally on May 1, 2016. (A-298-299¶1106.) The market was well aware of the specific risk of mounting political scrutiny over drug pricing in the lead-up to the 2016 election long before this alleged disclosure. (A-298¶¶1104-05.) Plaintiffs assert that "the market was reacting to *Mylan's* response to the comments" and not to Mr. Trump's posturing. (Br.59.) That argument fails because it lacks evidentiary support and does nothing to (i) establish that the risk that caused the alleged loss was within the zone of risk concealed by the alleged misrepresentation or (ii) disaggregate the alleged declines.

<u>November 3, 2016</u>. The district court rejected Plaintiffs' effort to show loss causation from the November 2016 *Bloomberg* article, because the article did not disclose "anything 'new'"; it merely repackaged existing information (as confirmed by Plaintiffs' own evidence). (SPA-199-201.) "The securities laws require disclosure that is adequate to allow investors to make judgments about a company's intrinsic value. Firms are not required . . . to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press" to escape 10b-5 liability. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010).

Here, as in *Omnicom*, a "generalized investor reaction of concern causing a temporary share price decline . . . is far too tenuously connected . . . to the [challenged] transaction[s] to support liability." *Id.* Also, a holding "otherwise would expose companies . . . to expansive potential liabilities for events later alleged to be frauds, the facts of which were known to the investing public at the time but did not affect share price, and thus did no damage to investors." *Id.*

Plaintiffs do not dispute that the fact "Mylan was a target of the [DOJ] investigation" had been "disclosed", at least, on December 4, 2015, February 16, 2016, May 3, 2016, and August 9, 2016, "all well before the *Bloomberg* article was published" on November 3, 2016. (SPA-199; A-299-300¶¶1109-12.) Instead, they argue that the *Bloomberg* article revealed "that [the] scope of the investigation had increased" and that DOJ was considering charges. (Br.58.) However, the article revealed nothing new about Mylan; instead, it referred to the DOJ investigation expanding to cover additional companies and additional drugs unconnected to Mylan or its personnel. (CA-31¶101.) Plaintiffs' assertion that investors "reasonably viewed the news that the investigation was heading towards indictments, and had expanded in scope, as showing that the risk to Mylan was materially greater than previously revealed" (Br.58) is pure speculation. DOJ never brought any charges against Mylan. Moreover, Plaintiffs failed to isolate the

effect of the allegedly corrective information on Mylan's stock price from that of the negative reporting on the investigation's expansion.  (Br.58 n.36.)

October 31, 2017.  Plaintiffs' challenge to the district court's ruling regarding the AG's amended complaint is similarly meritless.  The district court held that Plaintiffs failed to establish loss causation for three independent reasons: (1) the AG's amended complaint did not adduce new information showing a connection between anything Mylan said and new facts; (2) Plaintiffs failed to disaggregate losses caused by an earlier AG complaint; and (3) "to the extent that the amended AG complaint disclosed new information, it was new information that this Court has already dismissed in this case".  (SPA-201-202.)  Though each is determinative, Plaintiffs make no mention of the district court's second and third points, foreclosing their loss-causation argument as to the AG's amended complaint.

Plaintiffs do argue that the amended complaint "newly implicated Mylan's President Defendant Malik by name in the Doxy DR scheme".  (Br.60.)  However, Plaintiffs do not dispute that the AGs had previously disclosed (no later than December 2016) the alleged involvement of an unnamed Mylan executive in alleged antitrust misconduct.  (A-301-302¶¶1115-18.)  Plaintiffs' claim that the district court overlooked evidence that it was the disclosure of Mr. Malik's name that moved Mylan's stock price is incorrect.  (Br.60.)  There is no such evidence.

61

And even if there were, Plaintiffs failed to disaggregate the information about

Malik from other information contained in the amended complaint. ██████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

    <u>May 13, 2019</u>.  Finally, Plaintiffs point to disclosures on May 10, 2019

regarding the State AGs' announcement that they were filing a new lawsuit against

20 companies and 15 individuals, including Mylan and Mr. Nesta, and including

additional drugs.  (Br.60.)  The district court correctly found the disclosures

insufficient to establish loss causation because (1) the "lawsuit exclusively

concerned drugs that this Court had already rejected in the context of this

litigation" and (2) "there has been no proof adduced that the risk materialized and

that Defendants knew or should have known what that risk was (here, uncharged

antitrust allegations)".  (SPA-202-203.)  Here again, Plaintiffs address only part of

the district court's ruling, leaving dispositive elements unchallenged.

    In any case, none of Plaintiffs' assertions undermines the Decision.

Plaintiffs contend the district court did not dismiss Plaintiffs' allegations regarding

Levothyroxine (Br.61), but ignore the fact that the drug was already at issue in

lawsuits making similar allegations,[19] which Plaintiffs make no effort to disaggregate. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ but there is no evidence of that, and Mylan has not been criminally charged or been required to pay any penalties concerning generic drug pricing since this complaint was filed. Plaintiffs argue the district court "erred in limiting Plaintiffs' proof to evidence directly relating to 21 specific drugs" (*Id.*), but that argument fails for the reasons discussed above, including that Plaintiffs offered no evidence of collusion as to any drug. Although Plaintiffs also assert that "disaggregation between drugs is particularly inappropriate because the losses largely represented general reputational harm" (*Id.*), as noted, there is no legal or factual support for that assertion.

## III. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CASE AGAINST THE D&O DEFENDANTS.

Lastly, Plaintiffs contend the district court erred in dismissing their "claims against the D&O Defendants under Section 20(A)'s [sic] control person liability

---

[19] *See Am. Fed. of State, County and Mun. Empls. Dist. Cncl. 37 Health & Security Plan, et al. v. Mylan Inc., et al.*, No. 16-md-2724 CMR (E.D. Pa.) (filed Aug. 15, 2017); *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.*, No. 18-cv-284 CMR (E.D. Pa.), ECF 1 (filed Jan. 22, 2018).

provisions". (Br.62.) However, there can be no Section 20(a) liability absent a primary violation, and, as discussed, the district court properly rejected Plaintiffs' claims of a primary violation. As there is no liability under Section 10(b) and Rule 10b-5, summary judgment must also be granted to the D&O Defendants on the Section 20(a) claims. *See, e.g.*, *In re DNTW Chartered Acct. Sec. Litig.*, 666 F. App'x 78, 81 (2d Cir. 2016).

Even were there a primary violation, the Section 20(a) claims collapse because Plaintiffs cannot establish "culpable participation". "Culpable participation is established by alleging scienter on the part of a controlling person to the extent that it would satisfy § 10(b) and Rule 10b-5". *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018) (quotation omitted). The D&O Defendants offered unequivocal evidence that they acted in good faith—and not with scienter. Each stated under oath that:

- S/he believed the statements attributed to him/her to be true, accurate and complete;

- S/he relied on the due diligence of Mylan employees working in various aspects of the business; reviewed the materials; and asked questions to confirm that statements were accurate;

- S/he was not involved in, and did not have knowledge of, any unlawful conduct relating to (a) pricing for generic pharmaceuticals; or (b) the treatment of EpiPen for purposes of the MDRP;

- S/he never communicated with employees of Mylan's competitors to conspire concerning prices and market shares, and s/he is not aware of any such communications;

- S/he understood that Mylan's pricing decisions were made independently as a result of the robust and comprehensive process and is not aware of any price fixing agreements or agreements to allocate markets;

- S/he is not aware of any materially false or misleading statements in the Mylan SEC filings; and

- S/he was not involved in Mylan's processes for setting prices and determining what customers to pursue and was never a member of any pricing committee at Mylan.

(A-104-110¶¶9-44, A-164-167¶¶464-85, A-290-297¶¶1058-1100; CA-36-75.)

None of the "evidence" Plaintiffs cite creates a genuine issue of material fact.

Thus, these key facts are deemed admitted, foreclosing Plaintiffs' claims against

the D&O Defendants.

December 13, 2023

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by

_____
    */s/ David R. Marriott*
    David R. Marriott
    Rory A. Leraris
    Members of the Firm

Worldwide Plaza
 825 Eighth Avenue
 New York, NY 10019
  (212) 474-1000

*Attorneys for Defendants-Appellees Mylan N.V., Mylan Inc., Heather Bresch, Robert J. Coury, Paul B. Campbell, Rajiv Malik, Kenneth S. Parks and John D. Sheehan*

COZEN O'CONNOR P.C.,

by

_____
    */s/ Joseph Dever*
    Lenard Barrett Boss
    Joseph Dever
    Matthew L. Elkin

3 World Trade Center
 175 Greenwich Street, 55th Floor
  (212) 509-9400

*Attorneys for Defendant-Appellee James Nesta*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Local Rule 32.1(a)(4) because it contains 13,913 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

December 13, 2023

*/s/* David R. Marriott

_____

David R. Marriott